[No. S075875. Nov. 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY RUSSELL, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Kent Barkhurst and Nina Rivkind, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Rhonda Cartwright-Ladendorf and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—On September 4, 1998, a jury convicted Timothy Russell of the murders of Riverside County Sheriff's Deputies Michael Haugen and James Lehmann (Pen. Code,[1] § 187). The jury found true a sentencing enhancement allegation that defendant had used a rifle during the commission of the murders (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)); and found true a special circumstance allegation that defendant had intentionally killed Deputies Haugen and Lehmann during the performance of their duties as peace officers (§ 190.2, subd. (a)(7)), and a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)). The first penalty phase resulted in a mistrial. After a penalty retrial, the jury returned a verdict of death. The trial court denied defendant's motions for a new trial and for modification of the sentence, and sentenced defendant to death on both counts. The court also imposed four-year determinate sentences on both counts for defendant's personal use of a firearm, to run concurrent with the imposition of the death sentences. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Defendant and his wife, Elaine Russell, had a tumultuous and violent relationship. Early in the couple's relationship, defendant had a particularly violent encounter with his wife in which he threw furniture, ripped the phone cord from the wall, choked his wife, and held a gun to her head. During this incident, defendant told his wife that if she called the police, he would kill both her and the police.

In the early morning hours of Friday, January 3, 1997, following the years-long deterioration of the marriage, Elaine confronted defendant with her suspicion that he was using drugs. Defendant and Elaine had both previously used methamphetamine. Elaine asked defendant to leave the house the couple shared with their two children; defendant acquiesced. Defendant spent the rest of that night in the sign shop where he worked and sought the advice of his old friend, Jeffrey Alleva, later that day. Defendant and Alleva had not been in contact recently, although they had formerly been close friends.

Alleva testified that defendant appeared sad and concerned and indicated to Alleva that he needed to make changes and get his life in order. Defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

returned the next day and they discussed what defendant needed to do to get his life "back on track." Defendant left Alleva's home the evening of January 4, 1997, between 8:00 and 10:00 p.m. A bartender at the Red Barn bar in Palm Desert recalled defendant's arriving around 10:30 or 11:00 p.m. that same night. Defendant was quiet, drank three or four beers, and left the bar a few hours later. At 2:30 a.m. on January 5, 1997, defendant returned to the home he shared with Elaine, waking his sister-in-law, Beverly Brown, who was staying at the house. He asked Brown if he could talk with her; she agreed. Brown noted that defendant was "a little" intoxicated and appeared angry or disturbed, but defendant's affect did not cause Brown concern.

During his 10-minute conversation with Brown, defendant drank from a large bottle of beer. Brown later testified that defendant became more agitated, raised his voice, made large gestures, and made statements about his wife that Brown viewed as inappropriate. Defendant's conversation with Brown eventually woke Elaine and the couple's two children. Elaine emerged from her bedroom and asked defendant to leave, which caused defendant to become more agitated. Elaine left the room briefly; upon her return, defendant kicked her and threw her to the floor. Elaine begged for defendant to leave the house. Defendant finally agreed to leave. He tore the telephone wire out of the wall on his way out, yelling at Elaine and Brown "not to f—k with his job, his life, and not to call the cops."

After defendant left, Elaine quickly went to the house of her neighbors, John and Twilla Gideon, to call the police. Shortly thereafter, defendant returned to his house with an unloaded M-1 rifle, asking Brown where the bullets to the gun were located. Brown initially told defendant that she did not know, but after defendant threatened to kill Brown, she relented and told defendant where to find the bullets. Defendant had a history of recreational gun use and was proficient with the guns he owned, which included a .22-caliber Uzi firearm and the M-1 rifle. Defendant used the guns in target practice, and was described as a "very good shot."

Defendant threatened to hold Brown hostage because he knew Elaine was calling the police. He said that he would kill Brown if necessary. Defendant walked outside and fired his gun four or five times. Brown testified that defendant came back inside, telling her to get out because the police were on their way and he was "going to kill [the police]." Brown testified that defendant told her to take the kids and run. Brown took the children to the Gideons' house.

Brown noticed a police car arriving as she ran across to the Gideons' home. She took the children to the safety of the master bedroom at the rear of the Gideons' home, and shortly she thereafter heard around six shots fired.

After the shooting ceased, she and the Gideons crept to the front of the house to see what had happened. They looked through the kitchen window and saw lying in the street the bodies of Riverside County Sheriff's Deputies Michael Haugen and James Lehmann, who had been dispatched to respond to Elaine's call.

Deputy Lehmann had been shot in the head. Deputy Haugen had been shot in the chest and toe. Both men were dead by the time the next responding officer, Deputy Mark Smith, arrived at the scene. Both still had their weapons holstered.

Following the shooting, defendant ran into the desert; in the morning, between 7:00 and 7:30 a.m., he emerged from the desert and was arrested without incident. Defendant admitted firing shots in the air in front of the deputies, but said that he only shot to "scare" them.

Defendant made a number of statements to police concerning the shooting. Defendant first spoke with Senior Detective Eric Spidle the morning of January 5, 1997. Defendant offered to show Detective Spidle where he had dropped his gun, and the two drove into the desert where defendant showed Detective Spidle where he had placed the gun and ammunition. The weapon and other evidence were recovered, and defendant was taken to the Riverside County Sheriff's station, where his clothing was taken, his blood analyzed, and his body tested for gunshot residue. When defendant was taken into custody, he had no methamphetamine, cocaine, opiates, alcohol or lithium in his blood. He had an injury and blood on the right side of his face. An expert presented testimony that the gunshot residue found on defendant's hand and face at that time had a "very similar chemical composition" to the residue on the expended cartridges found at the scene of the crime. The gunshot residue found on defendant's face indicated the gun had been held close to his face when it was being fired.

Defendant initially declined to be interviewed, but later changed his mind and gave a videotaped interview after waiving his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) Defendant spoke at length about his deteriorating relationship with his wife, who had admitted to cheating on defendant and had left the couple's home with their children. About six months prior to the shootings, Elaine called defendant and asked if she and the children could return to the couple's home; defendant agreed. Prior to Elaine's return, defendant had been attending Alcoholics Anonymous meetings and felt like he was "able to handle life"; following Elaine's return home, defendant began drinking again.

Defendant explained that he was intoxicated on the night of the shooting, having consumed about a 12-pack of beer. After fighting with his wife,

defendant had left, then returned to his house with his unloaded gun and coerced Brown into giving him the ammunition she and Elaine had hidden. Defendant looked out the window and saw that the police were coming; he thought he was a "dead man" and "just felt it was all over." Defendant turned the lights off and left the house, hoping he could "sneak past" the officers. He was surprised that he could see the silhouettes of the officers, and was concerned that they could also see him. Defendant planned to fire shots in front of the officers to "scare 'em off" so that they would "run back the other way." Defendant fired several shots from a crouched position without sighting through the rifle scope, then ran into the desert. He did not know he had killed the officers until he was told by the interrogating officer.

Officers investigating the scene found defendant's gun in the location he had pointed out, with one live round in it and three magazines lying underneath it. While examining the scene, investigators found two groupings of .30-caliber shell casings around the same location, indicating that four rounds had been discharged at one target and eight rounds had been fired at a second target. Five more shell casings were found in the front yard of defendant's home.

The prosecution presented testimony from a forensic pathologist, who stated that the entrance trajectories of Deputy Lehmann's and Deputy Haugen's wounds were inconsistent with a hypothesis that the injuries resulted from ricocheted bullets. The trajectory of the bullet that killed Deputy Lehmann was slightly front to back, left to right, and slightly downward. Deputy Haugen's wound was consistent with the bullet's passing through his bulletproof vest before entering his chest, which only high-velocity projectiles are capable of doing.

### 2. Defense Evidence

The defense presented three witnesses during the guilt phase of the trial. Riverside County Sheriff's Sergeant David Wilson, a forensic supervisor who was at the crime scene when defendant reenacted the shootings, testified that he heard defendant state that he had been running southbound on a dirt road, had seen the deputies walk into the intersection and approach his home, and that he pointed his gun at the ground near the deputies and started shooting. Defendant said that he saw sparks, which might have been his shots ricocheting off the asphalt, and that he did not see the deputies after he fired the shots.

Charles Darnell, a retired Army officer with 22 years of service, reviewed defendant's military record, and testified that defendant, who had been training to be a medic, had received only the basic level of weapons training

that all soldiers receive. Defendant had the qualification of "marksman," the lowest qualification level a soldier could receive, and would have been trained using an M-16 rifle, rather than an M-1, which was used in the shooting. Darnell, who was familiar with the M-1, testified that the M-1 skews to the right when shot by a right-handed person and is not regarded as a sniper weapon, because it lacks the control and accuracy required for sniping. He also stated that the more rapidly shots are fired after the first shot, the less control a shooter has over the M-1. Kneeling or crouching would improve the accuracy of the shooter compared to shooting while standing.

Detective Eric Spidle, the prosecution's investigating officer, testified for the defense that in test-firing the M-1 for speed, he expended 12 rounds in 4.85 seconds and 2.9 seconds in two different tests. In a third test, he deliberately fired more slowly, and expended 12 rounds in 10 seconds. The test measured timing, and not accuracy.

### 3. *Rebuttal Evidence*

The Riverside County Sheriff's Department tested defendant's M-1 rifle in the condition it was in when received. Twelve shots were fired from a distance of 132 feet, and the rounds hit the target slightly high and to the left.

### B. *First Penalty Phase*

#### 1. *Prosecution Evidence*

The prosecution presented victim impact evidence from friends of the deceased officers and members of their families. Deputy Haugen's wife, Elizabeth, described the devastating effect her husband's death had on her and their two children, Katy and Stephen. The Haugens' niece, Jacqueline Mangham, provided more testimony relating to the impact of the death on Elizabeth and Stephen Haugen. Deputy Haugen's father-in-law, Geoffrey Mangham, stated that his wife grew ill after the funeral as a result of stress surrounding the death.

Deputy Lehmann's wife, Valerie, described the effect of his death on her and their children, six-year-old Ashley and 10-year-old Christopher. Deputy Lehmann's brother-in-law, James Odam, gave further testimony as to the death's impact on Christopher, who had become an angry child.

#### 2. *Defense Evidence*

The defense presented several witnesses during the first penalty phase. Gordon Young, a pastor at defendant's church who had provided counseling

to defendant and his wife, testified that defendant had made sincere efforts to reform his life and improve his marriage. Melvin Wachs, who employed defendant as a sign painter, testified that defendant had been one of his best employees. Wachs stated that defendant was generally punctual and got along with the other employees. In the period leading up to the homicides, Wachs testified that defendant seemed indecisive, and he appeared to be reaching out for help.

Detective Spidle testified to defendant's actions at the time of the arrest. Spidle stated that when he told defendant that the deputies were dead, defendant "tilted his head back, closed his eyes, became a little teary-eyed [and his] emotion changed a bit." He confirmed that he had described defendant in his report as "visibly emotional."

Defendant's mother, Lucille Williams, gave testimony as to the difficulties defendant faced while growing up. Williams testified that defendant's father was an alcoholic who died when defendant was 10 years old; Williams's subsequent husband abused defendant. Defendant behaved poorly while in school, dropped out, and joined the Army at age 17. Williams testified that defendant was "totally changed" and began having mood swings after being the victim of a beating and robbery in which he suffered severe head trauma. Defendant had problems with alcohol after leaving the Army. Williams testified that defendant's arrest was difficult for her, and that the arrest impacted his children. She stated that she did not believe defendant would intentionally take a life.

C. *Penalty Retrial*

With respect to the circumstances of the crime, most of the evidence presented at the penalty phase retrial was the same as the evidence presented during the original guilt phase. At the retrial, however, defendant's video-taped statements made following the shooting were not played. Instead, Detective Spidle testified about defendant's statements and his demeanor following the shootings. Additional forensic evidence was presented regarding the test-firing of defendant's M-1 rifle. Forensic scientist Richard Whalley testified that the gun fired five inches high and to the left, and if the gun was not lowered between each shot, the recoil caused the gun to elevate, increasing the angle of each subsequent shot. Mr. Whalley also testified that he conducted firing tests from heights of 32 and 42 inches from the ground, and the expended shell casings fell from the weapon in a 20-inch circle and a 17- to 19-inch circle, respectively.

### 1. Prosecution Evidence

The prosecution again presented evidence regarding the impact of Deputies Haugen's and Lehmann's deaths on their friends and family. Deputy Haugen's wife, Elizabeth, again testified regarding her 15-year relationship with her husband, how hard he had worked to gain acceptance into, and successfully complete, the police academy, and his devotion to his career. Deputy Haugen's niece also testified for a second time, relaying the contents of a letter Deputy Haugen had sent to her shortly before his death about his experience as a police officer.

Elizabeth Haugen learned of her husband's death from her neighbor, whose husband also worked for the sheriff's department. Stephen, Deputy Haugen's 10-year-old son, was very upset following his father's death; his grades slipped, his behavior became problematic, and eventually he decided to attend a boarding school to avoid being at his house. At the time of the penalty retrial, Stephen had been seeing a psychologist, taking antidepressants, and preferred living at a boarding school to living at his former home.

Deputy Lehmann's wife, Valerie, also testified again about her over-20-year relationship with her husband and the devastating impact of his death on her and their two children. Upon learning of her husband's death, Valerie became hysterical, called her family for help, and ran to a neighbor's house seeking assistance. When she returned to her home a short while later, she found her children hysterical after they had been told that their father was dead. Christopher, Deputy Lehmann's 10-year-old son, became an angry and agitated child following his father's death, and began having seizures shortly after his father's death. Ashley, Deputy Lehmann's six-year-old daughter, also became a very emotional child following her father's death and would not mention his name.

### 2. Defense Evidence

The defense presented evidence from Edward Verde, M.D., of the Veterans Administration medical center, who had no recollection of defendant but testified regarding his medical records. Dr. Verde testified that defendant was diagnosed with drug and alcohol dependence in 1984, and was treated, off and on, for a period of five months. Defendant failed to complete an addiction treatment program during that time. He returned to the hospital for treatment in August 1984, but was not admitted. For a three-month period between November 1986 and January 1987, defendant again attempted to, but did not, complete an addiction treatment program at the hospital.

In March and April 1996, defendant returned to the Veterans Administration medical center, where he was diagnosed with amphetamine, alcohol, and

marijuana dependency. Defendant complained of "feeling agitated" and having mood swings. Defendant was prescribed a low dose of lithium to control his mood swings, but failure to take the lithium would not have caused any adverse effects in light of the low dosage and brief duration of use. Defendant's chart indicated that he had had "homicidal ideations towards people who had betrayed him, but displayed no definite [plans]. He also displayed impulsivity—a lack of planning."

Jeffrey Alleva, who originally testified for the prosecution, testified for defendant at the penalty phase retrial. Alleva's testimony, concerning defendant's demeanor in the days leading up to the shootings, did not deviate from his previous testimony.

Defendant's previous employer, David Wakefield, testified that defendant was a normal, trustworthy employee. Wakefield testified that Elaine Russell had a verbal altercation with defendant while he was at work, and defendant called shortly thereafter and quit. Defendant's employer at the time of the shooting, Melvin Wachs, testified again on defendant's behalf, providing much the same testimony as he did at the first penalty phase trial. On the Friday before the shootings, while discussing his marital problems, defendant mentioned that he felt as though his wife had been putting "speed" in his coffee.

Defendant's mother testified on defendant's behalf at the second penalty phase trial; her testimony was consistent with her earlier statements. Pastor Gordon Young again testified on defendant's behalf, largely reiterating his earlier testimony, and adding that once defendant gave Pastor Young an Army rifle for safekeeping. Pastor Young also stated that he felt defendant made himself look better during counseling sessions by "fudging" the truth.

Detective Spidle offered testimony regarding defendant's statements to police following the shootings. Detective Spidle testified that defendant became "a little teary eyed" upon learning that Deputies Lehmann and Haugen were dead. Detective Spidle testified concerning the extent of defendant's cooperation with police—that defendant showed police the location where he had dropped the rifle, and agreed to be interviewed at the scene and at the police station. Detective Spidle stated that defendant was cooperative, and appeared regretful.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Alleged Instructional Error on Lying in Wait as Theory of Murder*

Defendant alleges that the trial court erroneously instructed the jury on the lying-in-wait theory of murder. He further alleges that the prosecutor improperly suggested that the jury could convict defendant of first degree murder based upon a lying-in-wait theory even if the jury believed defendant's account of the facts, which showed that no substantial period of watching and waiting occurred prior to the shooting. Defendant claims the prosecutor's suggestion, coupled with instructional error, violated defendant's rights to due process and a fair trial under the state and federal Constitutions. Defendant suggests his conviction is based potentially upon an erroneous theory of murder and must be reversed because it cannot be determined whether the jury relied on a legally adequate or inadequate theory to convict him of first degree murder.

During his interviews with Detective Spidle following the shootings, defendant explained that he saw the officers approaching, "saw the silhouette of them, and I thought well if I shoot in front of [them] . . . they'll run back the other way." Defendant then claims he "took off" running. When pressed later in the interview regarding the circumstances surrounding the shooting, defendant explained that his initial plan was to sneak past the officers. Defendant revised his plan when he realized he could see the officers and became concerned that they could also see him. Acknowledging that his initial plan of running past the officers would not help him evade detection, defendant explained that he crafted a new plan to run away from the officers and "put a line of fire down in front of [the officers] to turn them back." Defendant either slowed down or stopped while running away from the officers, aimed "in the general direction" of the officers' silhouettes, and shot at them a number of times.

The jury was instructed on the elements of first degree murder by lying in wait pursuant to CALJIC No. 8.25, and received a special instruction regarding lying-in-wait murder pursuant to defendant's request. CALJIC No. 8.25 defines murder by lying in wait "as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise [even though the victim is aware of the murderer's presence]. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. [¶] [The

word 'premeditation' means considered beforehand.] [¶] [The word 'deliberation' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.]" (CALJIC No. 8.25, original brackets.)

Defendant requested that the jury receive a special instruction regarding lying in wait. The court incorporated two paragraphs of defendant's requested special instruction into the instructions given to the jury; the court found that the remaining portion of the requested instruction was not a correct statement of the law.[2] Accordingly, the jury was instructed that "[i]n order to establish First Degree Murder based upon lying-in-wait, the perpetrator must exhibit a state of mind equivalent to, but not identical to, premeditation *and* deliberation. This state of mind is the intent to watch and wait for the purpose of gaining an advantage in taking the victim unawares in order to facilitate the act which constitutes murder. The concealment which is required is that which puts the defendant in a position of advantage from which one can infer that the principal act of lying-in-wait was part of the defendant's plan to take the victims by surprise. It does not include the intent to kill or injure the victim. In order to establish Lying in wait Murder, the prosecution must prove the crime involved the unlawful killing of a human being with malice aforethought. Malice may be express or implied." (Italics added.) During its deliberations, the jury requested clarification of the special instruction, noting that CALJIC No. 8.25 defined the requisite mental state as one akin to "premeditation *or* deliberation" while the special instruction defined the state of mind as equivalent to "premeditation *and* deliberation." (Italics added.) The court properly responded that the instructions should both be in the disjunctive. Shortly thereafter the jury returned its guilty verdicts on both counts of murder.

Defendant claims that there was insufficient evidence to establish that a substantial period of watching and waiting, a necessary element of lying-in-wait murder, occurred in this case. Defendant suggests that the prosecutor's argument that the jury could believe defendant's story and nonetheless convict him of lying-in-wait murder was erroneous because defendant would have had "at most a few seconds" to decide on his course of conduct, which defendant suggests is insufficient to constitute a substantial period of watching and waiting. Defendant also contends that the jury instructions concerning lying-in-wait murder were inadequate because they did not convey that the

---

[2] The rejected portion of defendant's requested instruction stated, "To establish murder by lying-in-wait the prosecution must prove the elements of concealment of purpose together with 'a substantial period of watching and waiting for an opportune time to act, and . . . immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage' " (relying on and citing *People v. Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr. 200, 749 P.2d 854], and *People v. Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]).

period of watching and waiting must be substantial. Because the jury may have convicted defendant based on a legally erroneous theory of lying-in-wait murder, defendant contends, his conviction must be reversed. We find no error concerning the sufficiency of evidence or jury instruction; accordingly, reversal is not required.

■ As a preliminary matter, we conclude that the jury instruction concerning lying-in-wait murder was adequate. Section 189 provides, in pertinent part, that "murder which is perpetrated by . . . lying in wait . . . is murder of the first degree." Lying-in-wait murder consists of three elements:[3] " ' "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.]' " (*People v. Cruz* (2008) 44 Cal.4th 636, 679 [80 Cal.Rptr.3d 126, 187 P.3d 970].) ■ We have repeatedly held that CALJIC No. 8.25 adequately conveys to a jury the elements of lying-in-wait murder. (*People v. Moon, supra,* 37 Cal.4th at p. 23; *People v. Ceja, supra,* 4 Cal.4th at p. 1139 ["we have repeatedly upheld the instruction, and continue to do so"]; see *People v. Hardy* (1992) 2 Cal.4th 86, 161–163 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Ruiz, supra,* 44 Cal.3d at pp. 613–615.)

■ Defendant argues that the instruction was inadequate because it failed to convey that the period of watching and waiting must have been "substantial." We considered and rejected a similar claim in *People v. Moon.* There, we noted that "[a]lthough we have held the period of watchful waiting must be 'substantial' [citation], we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is also not critical.' (*People v. Ceja*[, *supra,*] 4 Cal.4th 1134, 1145 . . . .) . . . [A] few minutes can suffice." (*People v. Moon, supra,* 37 Cal.4th at p. 23; see also *People v. Edwards* (1991) 54 Cal.3d 787, 823 [1 Cal.Rptr.2d 696, 819 P.2d 436] ["We have never required a certain minimum period of time, only a period not insubstantial. The instructions sufficiently convey this meaning."].)

Defendant acknowledges that "no particular words are necessary" to convey that the period of watching and waiting must be substantial, and

_____

[3] We note that first degree murder committed *by means of* lying in wait, at issue here, is distinct from intentional murder *while* lying in wait, as required by the related but distinct special circumstance not alleged here. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1140, fn. 2 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Because the requirements of the special circumstance are more stringent than the requirements of lying-in-wait murder, we have concluded that where substantial evidence supports the former, it necessarily supports the latter. (*People v. Moon* (2005) 37 Cal.4th 1, 23 [32 Cal.Rptr.3d 894, 117 P.3d 591].) We may look to analyses of the law of special circumstance cases even when addressing lying-in-wait murder. (*People v. Ceja, supra,* 4 Cal.4th at p. 1140, fn. 2.)

agrees that the period can be quite short. He argues, however, that although a few moments may be adequate, we have never concluded that a few seconds constitutes a substantial period of watching and waiting. While we have not previously considered this particular factual scenario, we have held on numerous occasions that "[t]he precise period of time is . . . not critical. As long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking his victim by surprise. In *People v. Edwards, supra*, 54 Cal.3d at page 825, we found that evidence from which the jury could infer that the 'defendant waited and watched until the [victims] reached the place of *maximum vulnerability* before shooting' supported a finding of lying in wait." (*People v. Ceja, supra*, 4 Cal.4th at p. 1145.)

■ Here, the jury may have concluded that defendant, in a rather short period of time, assessed his options and decided to shoot at the officers. Before he made his decision to shoot, however, defendant spent ample time planning his crime. He found bullets and loaded his weapon. He became agitated, went outside, and fired several rounds before returning to the house. He told Brown that he planned to kill the arriving officers. He formulated a plan to leave the house and sneak away, which he revised upon discovering that he could see the officers' silhouettes and becoming concerned that he was also visible. He shot at the officers from a position of advantage before the officers had time to even draw their weapons. Even a short period of time is sufficient to overcome an inference that a defendant acted rashly. (*People v. Stevens* (2007) 41 Cal.4th 182, 203 [59 Cal.Rptr.3d 196, 158 P.3d 763].) In *People v. Stevens*, the defendant committed a series of shootings at drivers of vehicles while driving his own vehicle. Immediately after completing one such shooting, the defendant set his sights on his next victim. He sped up to meet that victim, made a gesture requesting that his victim slow down, and once the victim did so, he shot the victim. "Once the intended victim slowed down, the time to act became opportune. Defendant stopped watching and started shooting. Such behavior is completely consistent with, and provides substantial evidence for, the watching and waiting element . . . ." (*Ibid.*) Like the defendant in *People v. Stevens*, defendant here quickly formulated a plan, and then he "stopped watching and started shooting." Defendant did not act rashly; he acted quickly once he had opportunity to do so.

We conclude that the evidence was sufficient to support the lying-in-wait theory of first degree murder, and the instructions adequately conveyed the elements of the crime. Because we find no error, we conclude that the jury's conviction was necessarily based on a legally adequate theory of murder and reversal is not warranted.

### 2. *Allegedly Erroneous Denial of Guilt and Penalty Phase Motions to Have Jury View Scene of Shooting*

Defendant alleges that the trial court erroneously denied his guilt and penalty phase motions to have the jury view the scene of the murder, in violation of article I, section 15 of the California Constitution as well as the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Before the beginning of the guilt phase, defendant filed a motion requesting that the jury view the scene of the shooting at night. Defendant contended that the "extreme darkness" at the scene was crucial to his defense theory that he did not intend to kill the officers. Defendant raised the issue twice more, and the prosecutor objected to the jury view. The prosecution contended that defendant's own statements revealed that he could see the officers' silhouettes, and could see well enough to note that there was a size discrepancy between the officers. Brown and Twilla Gideon also testified about the lighting conditions at the scene, explaining that they could see the officers' bodies lying in the intersection and that one of the officers had facial hair. The prosecutor argued that a jury view of the scene was unnecessary because the issue was not whether defendant could see the officers, but whether he aimed at them.

The trial court denied defendant's guilt phase motion, explaining that it would be impossible to duplicate the lighting conditions of the scene because the trial was conducted during the summer months, while the crime occurred in January. Additionally, the court explained that there was ample evidence that it was "pitch black" and "difficult to see" on the night of the murder. Finally, the court agreed with the prosecutor's argument that the issue was one of aiming, not one of visibility.

██ Section 1119 provides that "[w]hen, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, . . . it may order the jury to be conducted . . . to the place . . . ." We review a trial court's denial of a motion to view the scene of a murder "for abuse of discretion [citation], i.e., whether the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice." (*People v. Lawley* (2002) 27 Cal.4th 102, 158 [115 Cal.Rptr.2d 614, 38 P.3d 461], citing *People v. Sanders* (1995) 11 Cal.4th 475, 512 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Defendant argues that none of the trial court's stated reasons for denying the jury view motion withstand scrutiny; we disagree. Defendant argues at some length that the court's concern that lighting conditions would be difficult to duplicate is unfounded. In *People v. Williams*, we concluded that the trial court's reasons for denying a jury view motion—"that lighting and foliage conditions at the scene might be different than those prevailing at the time of the offense"—

were reasonable and correct. (*People v. Williams* (1997) 16 Cal.4th 153, 213 [66 Cal.Rptr.2d 123, 940 P.2d 710].) " 'When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view.' (*People v. Price* (1991) 1 Cal.4th 324, 422 [3 Cal.Rptr.2d 106, 821 P.2d 610].)" (*People v. Lawley, supra*, 27 Cal.4th at p. 158.)

Defendant argues that testimony that the scene was "pitch black" was not sufficient to "address the real issue of how that level of darkness affected visibility." Defendant also contends the trial "court failed to recognize that the visibility at the scene was highly relevant to whether appellant aimed at the officers." Defendant's arguments are unavailing. Defendant admitted that he was able to see the officers' silhouettes; we fail to see how a jury view of the scene would assist the jury in determining whether defendant aimed at those silhouettes. We conclude that the court did not abuse its discretion in denying defendant's request to have the jury view the scene of the murders. As the court noted, testimonial evidence adequately informed the jury as to the lighting conditions at the scene. The trial court reasonably concluded that a jury view—conducted at a different time of night and a different time of year with very different lighting conditions—was unnecessary.

■ Defendant again requested that the second penalty-phase jury be permitted to view the scene of the murders at night; the trial court denied his request. Defendant claims the court's denial violated his state law rights, as well as his Eighth and Fourteenth Amendment rights under the United States Constitution, because a view of the scene would have enabled defendant to rebut aggravating evidence and to establish lingering doubt. As the People cogently explain, a "capital defendant has no federal constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty." (*People v. Stitely* (2005) 35 Cal.4th 514, 566 [26 Cal.Rptr.3d 1, 108 P.3d 182].) In *People v. Stitely*, we explained that "[e]vidence that is inadmissible to raise reasonable doubt at the guilt phase is inadmissible to raise lingering doubt at the penalty phase." (*Ibid.*) For the same reasons we rejected defendant's guilt phase argument, we conclude that the trial court did not abuse its discretion by denying defendant's penalty phase motion to have the jury view the scene of the crime at night. Even assuming that the trial court erred in denying defendant's guilt and penalty phase requests, considering the ample evidence of the lighting conditions presented during both phases of the trial, we conclude that it is not reasonably probable that the jury would have returned a verdict more favorable to defendant (see *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]), and error, if any, was harmless beyond a

reasonable doubt (see *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]).

### 3. *Allegedly Erroneous Interference with Jury's Deliberations and Improper Coercion of Guilt Verdicts*

Defendant argues that the court's questioning of a juror after allegations of impropriety were made intruded upon the jurors' deliberations and coerced a guilty verdict in violation of defendant's rights to due process, a fair trial, and a unanimous jury verdict under the state and federal Constitutions. For the reasons addressed below, we conclude that defendant's claims are not meritorious.

After two days of deliberations, the court received a note from Juror No. 2 expressing concern about Juror No. 8's ability to deliberate objectively. The note explained that Juror No. 2 was concerned that Juror No. 8 was "unable to set aside her empathy for the defendant," "unable to set aside her own personal experience relating to mental illness," and that "she seems to be suffering personal angst during the process stating 'pick on somebody else, I can't do this anymore.' 'I've had it!' 'Can I abstain?' "

Upon receipt of this notification, the court asked counsel to address how it wished to proceed. Defense counsel argued that if the court thought "it would be appropriate, to call out the juror . . . referred to, which is Juror No. 8 and . . . make inquiry whether or not she's able to continue or is she deliberating," the court should do so. Because the note was received from a juror who was not the foreperson, the court suggested instead that it call the foreperson to see whether the issue raised by Juror No. 2 "is a problem and then take it from there." Counsel for both parties agreed. The court took a moment before the foreperson entered the court to make clear that it "tread[s] very lightly on these issues and [does not] want to intrude on the deliberations. . . . [B]y talking to the foreperson first," the court and parties will "get a better take on whether or not this is a general perception of the other jurors."

The court explained to the foreperson, Juror No. 12, that it had received a letter suggesting that there was a juror experiencing difficulty "setting aside his or her sympathy for the defendant and objectively deliberating on the case." Juror No. 12 agreed that there was an issue with a juror, and independently named Juror No. 8 as the individual experiencing the problem. The court clarified that it did not wish to intrude in any way in the deliberative process, and requested that the foreperson not mention the individual jurors' votes regarding guilt or innocence, but asked the foreperson to explain how jurors were "deliberating or refusing to deliberate."

The foreperson explained that Juror No. 8 was not refusing to deliberate because she was actively discussing the case with the jurors, but was expressing sympathy for the defendant, "[t]hat she feels sorry for him," "identifies with his plight so much that she . . . has projected," and "she is describing an emotional state . . . that she feels that she shares with the defendant . . . [and that] she used . . . as the basis of her decision." Juror No. 12 also explained that Juror No. 8 seemed particularly emotionally invested in, and emotionally drained by, the deliberations. Noting that it is an emotional experience, the foreperson explained that Juror No. 8 became so exhausted by the process that she refused to participate at one point, saying, " 'I wasn't going to talk today. I just wasn't going to say anything.' " The foreperson told the court that Juror No. 8 discussed how drained she felt, and seemed much more emotionally involved than the other jurors.

The court asked counsel how they wished to proceed in light of the foreperson's statement. Counsel for defendant requested that the jury continue its deliberations undisturbed. The People argued that it seemed, based upon the letter and the foreperson's statement, that Juror No. 8 was basing her decision upon personal experience instead of the evidence, against the court's instruction, and that she may be unable to set aside her sympathy for defendant. The People argued, and the court agreed, that direct inquiry of Juror No. 8 was mandated.

The court stressed with Juror No. 8 that it would not be asking how she or any other jurors were voting, but only whether any "jurors are using pity or sympathy for a defendant in any way in this case." The court explained that the jury's instructions and "black letter law [require] that a juror must not in any case allow pity or sympathy for a defendant to interfere with the deliberation process or influence his or her vote in the jury process." The court asked if Juror No. 8 believed her feelings of sympathy for defendant interfered with her deliberative process, to which she responded in the negative. Juror No. 8 explained that she understood both that it would be unfair and against the law to allow her sympathy for defendant to interfere with the deliberative process, and that she understood that she could not allow a particular personal event in her background to interfere with or influence her objectivity. The court directed Juror No. 8 not to allow events in her past to "interfere with [her] objectivity in this case" and "direct[ed her] to further deliberate with the jurors. That means to discuss the evidence. Objectively." Juror No. 8 explained that the jury had "gone over and over" the evidence, and the court directed her to return to the deliberation room and continue to deliberate.

The People expressed concern that Juror No. 8's statements apparently conflicted with the statements in the note and those made by the foreperson.

The court stated that it did not wish to further question jurors, but would do so if there were further problems. Defense counsel offered no argument following Juror No. 8's questioning, nor did defense counsel object to Juror No. 8's continued service on the jury. Defendant now contends that the court made a number of errors—namely, that it erred by questioning Juror No. 8, that the court's questions of Juror No. 8 were intrusive, that the court's instructions to Juror No. 8 were coercive, and that the court made an unnecessary comment to the foreperson—each of which, individually or collectively, mandate reversal. We disagree.

As an initial matter, the People suggest that defendant's claims concerning Juror No. 8 are barred because he invited the error by initially suggesting that the court question Juror No. 8. As the People explain, the doctrine of invited error applies when a defendant, for tactical reasons, makes a request acceded to by the trial court and claims on appeal that the court erred in granting the request. (*People v. Williams* (2008) 43 Cal.4th 584, 629 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Here, although defendant initially suggested that the court question Juror No. 8, and acquiesced to the court's alternate suggestion that it first question the foreperson, defendant ultimately reversed his position, suggesting that the jury should continue deliberating without questioning Juror No. 8. The court rejected defendant's later suggestion, and questioned Juror No. 8. Accordingly, we conclude that defendant did not invite any error he now claims occurred.

The People suggest in the alternative that defendant's claims concerning Juror No. 8 are forfeited. Defendant did not object to the trial court's decision to "bring out . . . Juror No. 8" after the prosecution suggested that the court do so. After the court admonished Juror No. 8, it engaged in a brief colloquy with the prosecutor regarding whether any further steps were necessary. Defense counsel did not comment throughout the duration of the court's exchange with Juror No. 8, nor did counsel join in the conversation between the prosecutor and the court after Juror No. 8 left the courtroom. Defense counsel did not object to Juror No. 8's continued service on the jury, and did not request a mistrial based upon juror misconduct. A claim of prejudicial misconduct is waived when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice. (*People v. Stanley* (2006) 39 Cal.4th 913, 950 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Here, defendant's claim that the court's questions of Juror No. 8 constituted reversible error because they were improper, intrusive, and coercive is forfeited because defendant failed to object. As discussed more fully below, defendant's claims additionally fail on the merits.

■ As defendant aptly points out, "[t]he secrecy of deliberations is the cornerstone of the modern Anglo-American jury system." (*U.S. v. Thomas* (2d Cir. 1997) 116 F.3d 606, 618.) Courts must exercise care when intruding into the deliberative process to ensure that the secrecy, as well as the sanctity, of the deliberative process is maintained. (See *People v. Cleveland* (2001) 25 Cal.4th 466, 475 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) "The need to protect the sanctity of jury deliberations, however, does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations." (*Id.* at p. 476.) In *People v. Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081], we held that the court had a duty to investigate an allegation of juror misconduct, emphasizing that "when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud. The law is clear, for example, that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute."

■ Here, the court did nothing more than follow established law by investigating, to as limited an extent as possible, allegations that a juror was unable to perform her duties. Because the court has the power to discharge a juror who is unable to perform his or her duties pursuant to section 1089, a court may also undertake less drastic steps to ensure that a juror is able to continue in his or her role. (*People v. Keenan, supra,* 46 Cal.3d at p. 533.) Defendant argues that the court interfered with the secrecy of the deliberations, and asked improperly intrusive questions, when it interviewed Juror No. 8, based upon what he characterizes as Juror No. 2's "unsubstantiated concerns." Defendant's arguments are demonstrably specious; indeed, defendant initially suggested that the court question Juror No. 8 after being made aware of Juror No. 2's letter expressing concern regarding the deliberative process. Moreover, the court was mindful of its potential impact on the deliberative process, explaining before it questioned both the foreperson and Juror No. 8 that it did not wish to know individual votes, that it wished to limit its impact on the deliberative process, and that it sought only to ascertain the extent of any potential misconduct.

■ In *People v. Cleveland,* we explained that "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*People v. Cleveland, supra,* 25 Cal.4th at

p. 485.) Upon hearing that Juror No. 8 was not permitting her sympathy for defendant to interfere with her deliberations, and that she understood that she could not permit events in her personal life to obscure her objectivity in the case, the court directed her to adhere to her oath as a juror and return to deliberations. The court intruded as minimally as possible to satisfy its dual goals of investigating allegations of misconduct while preserving the secrecy of the deliberative process. Accordingly, we conclude that the court did not abuse its discretion when questioning Juror No. 8, either by improperly intruding upon the secrecy of deliberations, or asking improperly intrusive questions.

 Defendant next suggests that the court's comments to Juror No. 8 were coercive. We disagree. "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265 [10 Cal.Rptr.2d 636, 833 P.2d 643].) In *People v. Pride*, addressing the admittedly distinct circumstance of a deadlocked penalty-phase jury, we explained that coercion was not present where the court did not comment on the vote; suggested that the status of the vote was irrelevant; did not tell the jury to reach a verdict within a particular period of time; and otherwise did not constrain the jury. (*People v. Pride*, *supra*, 3 Cal.4th at pp. 265–266.) Here, similarly, the court explained that it did not wish to know Juror No. 8's personal vote, nor the votes of any other members of the jury, and did not constrain Juror No. 8 or the jury except to require that the jury abide by the instructions given.

More specifically, the court instructed Juror No. 8 that she could not permit her feelings of pity and sympathy for defendant to influence her deliberative process and directed her not to permit "a particular personal event in [her] life . . . to interfere with [her] objectivity in this case." It then directed her to resume deliberations. The court at no time suggested that it favored any particular verdict; indeed, it stated, "I am not and will not be asking you questions about how people are voting or how you are voting, one way or the other. It doesn't make any difference to me." We conclude that neither the court's instruction to Juror No. 8 to follow the law, nor the court's express statement that it did not wish to know the votes and that such knowledge made no difference, was coercive. As in *People v. Pride*, the court's instruction that deliberations continue cannot be construed as coercive. (*People v. Pride*, *supra*, 3 Cal.4th at p. 266.)

Defendant makes a few final arguments without reference to any authority. He first contends the court's comment to the foreperson, "I'll discuss with the attorneys if we have any recourse," improperly invaded the secrecy of the jury's deliberations. He also suggests that the court's colloquy with the foreperson was improper because the court neither requested that the foreperson keep the exchange confidential, nor did the court hold the conversation in

front of the entire jury, as defendant contends it should have done had it intended that the conversation be public. None of these contentions has merit. The court's comment to the foreperson that it would discuss with the attorneys how it wished to handle the allegations of misconduct raised against Juror No. 8 was nothing more than an informative, offhand comment regarding the next step the court planned to take. It did not invade the secrecy of the deliberations in any way. Moreover, the court's decision not to hold the exchange between it and the foreperson before the entire jury was not an abuse of its discretion. The sanctity of deliberations must be protected, and courts must act reasonably when inquiring about potential misconduct. (*People v. Cleveland, supra,* 25 Cal.4th at p. 476.) Conducting such an inquiry before the entire panel, rather than discreetly questioning the foreperson regarding alleged misconduct before taking further action, arguably would be more intrusive and less reasonable than what occurred here. Accordingly, we conclude that the trial court did not abuse its discretion when it minimally intruded upon the deliberative process to question the foreperson regarding an allegation of misconduct.

Because we conclude that the trial court did not err by questioning the foreperson or Juror No. 8 regarding allegations of misconduct, reversal is not warranted under either the harmless error or the reasonable probability standards proposed by defendant. (*Chapman v. California, supra,* 386 U.S. 18; *People v. Watson, supra,* 46 Cal.2d 818.)

### 4. *Alleged Instructional Error on Consciousness of Guilt Consistent with CALJIC No. 2.03*

This claim concerns the inconsistencies in defendant's and Brown's statements regarding whether or not defendant told Brown that he planned to kill the officers. On the night of the murders, after firing several shots into the air, defendant returned to the home he had shared with his wife and told Brown that police were coming and that "he was going to kill them." When asked whether he used those words, Brown replied in the affirmative. Brown was later impeached on cross-examination when she was confronted with her earlier grand jury testimony that defendant told her only that "the police were coming and that he [(defendant)] was going down." While being cross-examined, Brown explained that when she gave her testimony before the grand jury she did not recall precisely what defendant had said concerning his plans to kill the police officers, but that the "gist" of defendant's comments was that "he was going to kill the cops."

Immediately following his arrest, defendant agreed to be interviewed by Detective Spidle regarding the shootings. During that first interview, defendant told Detective Spidle that he "never told" Brown that he planned to shoot

the responding officers, and never said "anything about if the cops come I'm gonna shoot 'em." Detective Spidle returned the next day to continue defendant's interview, and asked defendant whether he recalled saying, " 'The cops are comin', I don't care, I'll take them out too.' " Defendant replied that he didn't "remember saying that but it's very possible that I did, yes."

Based on these inconsistent statements, the prosecutor asserted during closing argument that the jury could "conclude that [defendant] was lying, [and that] he did, in fact, threaten the police officers . . . [and] did what he told [Brown] he was going to do. He was going to kill the cops. [¶] The judge is going to tell you that if you find that [defendant] lied to [Detective] Spidle you can use what is called a consciousness of guilt. He has something to hide."

The jury was instructed based on CALJIC No. 2.03, which currently and as given provides: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

Defendant argues that the trial court erroneously instructed on consciousness of guilt, and that the court's error in giving this instruction violated defendant's Sixth and Fourteenth Amendment rights under the United States Constitution, as well as his rights pursuant to article I, sections 7, 15, and 16 of the California Constitution. Defendant primarily argues that the court erred in instructing the jury pursuant to CALJIC No. 2.03 because there was insufficient evidence supporting the instruction. Defendant also contends that the instruction permitted the jury to draw an improper inference concerning defendant's intent in committing the shootings, and contends that the instruction is impermissibly argumentative. For the reasons explained below, we reject each of defendant's contentions.

■ Defendant first contends that no evidence supported instructing the jury pursuant to CALJIC No. 2.03. Defendant argues that his initial responses to Detective Spidle's questions as to whether he told Brown he planned to harm the officers, namely, "I never told [Brown] that" and "No," do not constitute sufficient evidence of a false or deliberately misleading statement to explain his conduct. CALJIC No. 2.03 is properly given when there exists evidence that a defendant made a deliberately misleading or false statement to explain his or her conduct. (See *People v. Page* (2008) 44 Cal.4th 1, 50–51 [79 Cal.Rptr.3d 4, 186 P.3d 395].) Here, defendant argues that his initial denial to Detective Spidle that he told Brown that he planned to harm the officers and

his later equivocation regarding the same statement "cannot reasonably be considered a prefabricated story to explain his conduct" because even if his earlier statement to Detective Spidle was untrue, the statement does not demonstrate defendant's consciousness of guilt. Defendant does not dispute that he made inconsistent statements regarding whether he told Brown he planned to kill the officers, from which a jury could conclude that at least one of the statements was untrue. "The jury could rationally infer that defendant made a false statement to deflect suspicion from himself." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1057 [63 Cal.Rptr.3d 82, 162 P.3d 596].) Accordingly, the trial court did not err by instructing the jury pursuant to CALJIC No. 2.03.

Moreover, we conclude that ample additional evidence was presented justifying the court's decision to instruct the jury pursuant to CALJIC No. 2.03. In addition to the inconsistent statements regarding defendant's stated intent to harm the officers, the prosecution suggests that CALJIC No. 2.03 would have been appropriately given to the jury to consider the conflicting evidence that defendant initially planned to sneak past the officers as they approached and his later decision to run in the opposite direction; and defendant's statement to Brown that he planned to "take out" the officers, and defendant's later testimony that he intended only to shoot in front of the officers to scare but not to injure them. Ample evidence of defendant's potentially false or deliberately misleading statements was presented; accordingly, the trial court did not err by instructing the jury with CALJIC No. 2.03.

Defendant also contends that his inconsistent statements do not demonstrate that he was "being willfully false in any meaningful way." Defendant relies on *People v. Mattson* (1990) 50 Cal.3d 826, 872 [268 Cal.Rptr. 802, 789 P.2d 983], in which we noted that the inference of consciousness of guilt and the probative value of a denial are "tenuous" where a defendant initially denies but later confesses to committing a crime. Defendant argues that the connection between the inconsistent statements here is even more tenuous. We disagree.

■■■ We recently clarified our earlier statement in *People v. Mattson*, explaining: "The fact that a defendant initially denies involvement and later makes admissions certainly supports a conclusion that the earlier statement was a lie made to avoid detection or culpability. Even when a defendant confesses, his or her state of mind or other details of a crime may remain in dispute. The fact that a defendant initially denied culpability and later made admissions are relevant facts, which must be weighed in light of all the evidence." (*People v. Carrington* (2009) 47 Cal.4th 145, 188 [97 Cal.Rptr.3d 117, 211 P.3d 617] (*Carrington*).) Here, as in *Carrington*, "defendant admitted [his] role in . . . the crimes," but his "counsel continued to dispute

[his] state of mind." (*Ibid.*) We found no error in *Carrington*, and reach the same conclusion here. Although defendant did not initially deny culpability and later recant, his inconsistent statements concerning his intent to harm the responding officers, like the inconsistent statements in *Carrington*, "certainly support[] a conclusion that the earlier statement was a lie made to avoid detection or culpability." (*Ibid.*)

Defendant argues that instructing the jury pursuant to CALJIC No. 2.03 allowed the jury to improperly infer guilt from evidence that otherwise would not have properly been susceptible of such an inference, and that the instruction was impermissibly argumentative. Defendant acknowledges that we have repeatedly rejected these claims and presents us with no reason to reconsider our earlier decisions. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [97 Cal.Rptr.3d 412, 212 P.3d 692]; *Carrington, supra,* 47 Cal.4th at p. 188.)

Defendant argues that the court's error in instructing the jury pursuant to CALJIC No. 2.03 requires reversal because it cannot be demonstrated that the error was harmless beyond a reasonable doubt pursuant to *Chapman v. California, supra,* 386 U.S. at page 24. In light of defendant's numerous taped confessions, we conclude that error, if any, in instructing the jury pursuant to CALJIC No. 2.03 was harmless.

### 5. Alleged Instructional Error That Jury Need Not Agree Whether Defendant Committed a Premeditated Murder or Lying-in-wait Murder

Defendant contends that the trial court's failure to require that the jury unanimously decide which statutory form of first degree murder he committed—deliberate and premeditated or by lying in wait—violated his rights under the state and federal Constitutions to due process, to have the state establish proof of murder beyond a reasonable doubt, and to a reliable determination of whether he committed a capital offense. As defendant acknowledges, we have previously considered and rejected such claims. (See *People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Hardy, supra,* 2 Cal.4th at p. 162.) In *Schad v. Arizona* (1991) 501 U.S. 624, 636 [115 L.Ed.2d 555, 111 S.Ct. 2491], the high court held that a jury need not unanimously decide the theory of murder, felony or malice, upon which it based its guilty verdict, because those theories are not distinct elements of the crime but are instead merely distinct means of committing the offense. Defendant urges us to distinguish *Schad v. Arizona*; we decline to do so.

 Defendant argues that lying-in-wait murder requires proof of different elements than for deliberate and premeditated murder, and accordingly

requires that a jury unanimously decide on the theory underlying its first degree murder verdict. To support his argument, defendant relies on two high court cases, both of which address the legal significance of distinguishing between elements of a crime and the means of committing a crime. (*Schad v. Arizona, supra*, 501 U.S. at p. 637; *Richardson v. United States* (1999) 526 U.S. 813, 817 [143 L.Ed.2d 985, 119 S.Ct. 1707].) The significance of the distinction between the elements of a crime and the means of its commission is not lost on this court; however, defendant fails to cite any authority suggesting that deliberate and premeditated murder has elements distinct from lying-in-wait murder. Indeed, as the People point out, defendant's contention is erroneous. We considered and rejected a similar argument in *People v. Hardy*, in which we concluded, "This court . . . views lying in wait 'as the functional equivalent of proof of premeditation, deliberation and intent to kill.' " (*People v. Hardy, supra*, 2 Cal.4th at p. 162, quoting *People v. Ruiz, supra*, 44 Cal.3d at p. 614.) Because lying in wait and deliberate and premeditated theories of murder are simply different means of committing the same crime, juror unanimity as to the theory underlying its guilty verdict is not required. Defendant presents us with no compelling reason to reconsider our sound prior reasoning to that effect.

Finally, defendant argues that the trial court's erroneous failure to require juror unanimity constituted structural error requiring reversal of the entire judgment. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 282 [124 L.Ed.2d 182, 113 S.Ct. 2078].) Because we find no error, structural or otherwise, reversal is not warranted.

### B. *Penalty Retrial*

#### 1. *Allegedly Erroneous Denial of Defendant's Motion to Admit His Recorded Statements to Police*

Defendant argues that the court's denial of his request to introduce, as evidence of the circumstances of the crime and of his character and background, the three videotaped statements he made to police following his arrest violated his rights to due process and a fair and reliable penalty determination under the state and federal Constitutions, as well as section 190.3, factors (a) and (k).[4] Defendant concedes that the statements constitute hearsay but nonetheless argues that they were admissible under *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] (*Green*) because

---

[4] Section 190.3, provides in pertinent part that "the trier of fact shall take into account" "(a) [t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," and "(k) [a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factors (a), (k).)

the evidence was reliable and highly relevant, and its exclusion violates defendant's right to due process. Defendant also argues that the tapes were admissible character evidence as nonhearsay or as exceptions to the hearsay exclusion. The trial court concluded that the statements were relevant to the issues of lingering doubt and defendant's alleged remorse, but that they were self-serving statements and therefore unreliable and inadmissible.

At the guilt phase, the taped statements were introduced by the prosecution as party admissions pursuant to Evidence Code section 1220. Defendant suggests that because the prosecution introduced the statements during the guilt phase of the trial, it must be precluded from objecting to introduction of those same statements in a penalty retrial. During the penalty retrial, the prosecution did not seek to introduce the taped statements, and defendant was not able to avail himself of Evidence Code section 1220 because that provision applies only to statements offered against a party declarant, not offered by that party. (Evid. Code, § 1220.) Defendant argued that the statements were relevant and admissible as evidence concerning the circumstances of the crime and as mitigating evidence, and were admissible pursuant to section 190.3, factors (a) and (k). The prosecution argued that the statements should be excluded, even if relevant, because they were unreliable, self-serving hearsay. The prosecutor argued that the statements were made nearly 12 hours following the shootings and over four hours after defendant's arrest—not immediately following defendant's being made aware of the officers' deaths. The prosecution also noted that defendant initially did not want to speak with law enforcement officers, and that his eventual statements were inconsistent with the physical evidence and lacked corroboration.

 In *Green*, the high court held that due process requires that highly relevant mitigating evidence may be introduced, though hearsay, where "substantial reasons existed to assume its reliability." (*Green, supra*, 442 U.S. at p. 97.) Here, no indicia of reliability are present. Defendant's self-serving statements concerning the circumstances of the crime were uncorroborated; indeed, the physical evidence suggests that defendant's account of the shootings was false. For example, defendant claimed that he aimed several yards in front of the officers, but the physical evidence suggested that the bullet wounds could not have been the result of ricochet. The statement in *Green*, in contrast, was a corroborated confession of the codefendant sufficient to produce a conviction and capital sentence for that codefendant. (*Ibid.*) We conclude that the trial court did not err by concluding that the statements, though relevant, were not as highly reliable as was the statement in *Green*.

Defendant attempts to distinguish several cases in which we concluded that taped statements made by a defendant could not be introduced for their truth during the penalty phases of the trial. (See *People v. Jurado* (2006) 38 Cal.4th

72, 128–130 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Weaver* (2001) 26 Cal.4th 876, 980–981 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Stanley* (1995) 10 Cal.4th 764, 838–840 [42 Cal.Rptr.2d 543, 897 P.2d 481].) In each of the cases cited by defendant, we concluded that the trial court did not err under *Green* when it excluded, or provided limiting instructions concerning, self-serving statements sought to be introduced by the defendants during the penalty phases of their trials. (See *People v. Jurado, supra,* 38 Cal.4th at pp. 128–130; *People v. Weaver, supra,* 26 Cal.4th at pp. 980–981; *People v. Stanley, supra,* 10 Cal.4th at pp. 838–840.) Defendant contends that his case is distinguishable because his statements were introduced during the guilt phase of his trial, but excluded at the penalty phase. We see no distinction; in all instances, the trial courts reasonably concluded that the due process considerations underlying the high court's decision to permit the introduction of highly reliable, relevant evidence in *Green* were not present in these cases involving self-serving, uncorroborated statements made by defendants. (See *People v. Jurado, supra,* 38 Cal.4th at pp. 128–130; *People v. Weaver, supra,* 26 Cal.4th at pp. 980–981; *People v. Stanley, supra,* 10 Cal.4th at pp. 838–840.)

We also reject defendant's contention that there exists an independent state law basis to introduce his videotaped statements. Defendant argues that this court possesses the inherent authority to recognize exceptions to the hearsay rule, though he acknowledges that we "do so cautiously in light of the venerable policy against admitting declarations by witnesses who cannot be cross-examined." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 27 [45 Cal.Rptr.3d 407, 137 P.3d 229].) Defendant suggests that the reliability of his statements, coupled with the fact that the statements were introduced at the guilt phase of his trial, compels this court to recognize a narrow exception to the hearsay rule. We disagree. As previously explained, the statements are self-serving and uncorroborated by physical evidence; defendant presents us with no reason to ignore our admonition to proceed cautiously when recognizing exceptions to the hearsay rule.

█ Defendant also contends that the court must read sections 190.3 and 190.4 in conjunction, to require that statements introduced by the prosecution during the guilt phase of a trial must be introduced at the penalty phase of a trial if the defense so requests. Not so. A plain reading of section 190.4 reveals the flaw of this argument. Section 190.4, subdivision (d) provides in pertinent part: "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial . . . shall be considered at any subsequent phase of the trial, *if the trier of fact of the prior phase is the same trier of fact at the subsequent phase.*" (Italics added.) The corollary of this rule is plain—where the trier of fact at a subsequent phase of a trial is not the same as the trier of fact at a previous phase, it is not the case that evidence presented at that prior phase "shall be considered" at the

subsequent phase. The same evidence certainly *may* be considered, but, to be considered, that evidence must be admissible. As explained, *ante*, the video-taped statements were inadmissible hearsay evidence, and no exception permitting their admission applies.

Finally, defendant suggests that his nonverbal conduct on the tapes was character evidence of his remorse admissible under section 190.3, factor (k). The People argue that defendant forfeited this claim by failing to argue in the briefing or argument before the trial court that he sought to introduce the nonassertive conduct on the tapes as mitigating character evidence. Assuming without deciding that the argument is not forfeited and is meritorious, any error was harmless. Detective Spidle testified regarding defendant's emotional state while defendant made the statements. Detective Spidle noted that he used the word "remorse" in his report, though he believed it would be more accurate to say that defendant felt regret. Detective Spidle also explained that defendant was initially cooperative with the police, showing them where he had hidden the gun. Upon learning that the officers were dead, Detective Spidle testified that defendant became teary eyed and visibly emotional. We conclude that defendant was able to, and did, present evidence of remorse; any error in failing to admit the nonassertive conduct contained in defendant's taped statements was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

### 2. *Allegedly Erroneous Excusal of Prospective Jurors*

Defendant argues that the trial court erroneously excused seven prospective jurors prior to voir dire based upon their answers to jury questionnaires in violation of his rights to a fair trial, due process, and a reliable penalty determination under the state and federal Constitutions. For the reasons addressed below, we reject defendant's claim.

The trial court and the parties discussed and agreed upon the language of the penalty retrial jury questionnaires. Prior to conducting voir dire, the court informed the parties that it had reviewed all of the completed jury questionnaires and had made a tentative ruling as to about 25 prospective jurors, which it reviewed with the parties. The court explained that it wished to "solicit any opposition from counsel" before it excused the jurors, and ensure that the parties had "an opportunity to be heard." The court then proceeded in numeric order to discuss the jurors about whom it had concerns or "red flags" based upon the answers in the jury questionnaires. On a number of occasions, either defense counsel or the prosecutor indicated his desire for the court to conduct further inquiry of the prospective juror at issue, which the court agreed to do.

██ The court stated the remaining prospective jurors should be dismissed immediately, to which defense counsel replied "no objection" or "submit it." Defendant now contends that seven prospective jurors were rejected because their responses to the questionnaires suggested some objection to the death penalty, which violated the *Witherspoon-Witt* rule that a prospective juror opposed to the death penalty may only be excused when that juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].)

The People argue that defendant invited any error by agreeing with the questions posed in the questionnaire and agreeing to the excusal of the seven prospective jurors. Assuming without deciding that error was not invited and the claim is not forfeited, we conclude that the court did not err by excusing the seven prospective jurors opposed to the death penalty. We review de novo a trial court's decision to excuse a prospective juror based solely upon that juror's written response to a questionnaire. (*People v. Avila* (2006) 38 Cal.4th 491, 529 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) In *People v. Avila*, we concluded that a trial court's excusal of four prospective jurors based solely upon their written responses to the jury questionnaire was proper because the jurors' responses demonstrated an inability to perform their duties as jurors. (*People v. Avila, supra*, 38 Cal.4th at pp. 529–533.) *People v. Avila* distinguished our decision in *People v. Stewart*, in which we held that the trial court erred by excusing for cause five prospective jurors based upon their answers to a jury questionnaire that asked whether the prospective juror's views on the death penalty would prevent or make it very difficult for him or her to impose the penalty. (*People v. Stewart* (2004) 33 Cal.4th 425, 442, 444–445 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Avila, supra*, 38 Cal.4th at p. 530.) Based on the "make it very difficult" language in the questionnaire, we concluded in *People v. Stewart* that it was not possible to ascertain whether a juror's response supported disqualification under the *Wainwright v. Witt* standard requiring that such person's views on the death penalty would prevent or substantially impair that person's ability to perform his or her duties. (*People v. Stewart, supra*, 33 Cal.4th at pp. 444–445; *Wainwright v. Witt, supra*, 469 U.S. at p. 424.)

Here, the questions did not suffer from the same deficiency present in *People v. Stewart*; the questions probed whether a prospective juror would experience difficulty imposing the death penalty, but also very directly asked whether a juror would "always" vote for or against the death penalty no matter what the evidence demonstrated. From a prospective juror's responses, it was possible to ascertain whether that juror would automatically vote for or against the death penalty, and thus whether that juror would be prevented

from performing his or her duty. (See *Wainwright v. Witt, supra,* 469 U.S. at p. 424.) Defendant attacks each of the questions individually but fails to consider that, considered collectively, the questions here, like those in *People v. Avila,* "included . . . expansive and detailed questions on capital punishment and gave jurors the clear opportunity to disclose views against it so strong as to disqualify them for duty on a death penalty case." (*People v. Avila, supra,* 38 Cal.4th at p. 531.)

Defendant argues that the questionnaires inadequately queried whether the prospective jurors' views regarding the death penalty would interfere with the requirement that jurors follow the law. We disagree. As was also the case in *People v. Avila,* the responses to questions posed to prospective jurors here suggest that the court properly excused the prospective jurors for cause "based solely on [their] answers to the written questionnaire [because] it is clear from the answers that [the prospective jurors are] unwilling to temporarily set aside [their] own beliefs and follow the law." (*People v. Avila, supra,* 38 Cal.4th at p. 531.) "With respect to each of these excusals, we conclude that the trial court's determinations, based solely on the questionnaire responses, were correct." (*Ibid.*)

Defendant challenges the court's excusal of Prospective Juror R.D., explaining that R.D.'s responses were not "clear, unequivocal, and internally consistent," as were the responses of the prospective juror in *People v. Avila,* R.V., who had "indicated she strongly opposed the death penalty and would in every case automatically vote for life imprisonment without the possibility of parole, regardless of the evidence that might be produced during trial." (*People v. Avila, supra,* 38 Cal.4th at p. 531.) We conclude Prospective Juror R.D.'s responses were analogous to those of Prospective Juror R.V. discussed in *People v. Avila.* When asked if there existed "any religious or moral feeling that would make it difficult or impossible for you to sit in judgment of another person," R.D. responded that he was "against capital punishment," and went on to explain that he would "not always" follow the law if it differed from his beliefs, that his "no on capital punishment" feelings might prevent him from being a fair and impartial juror, that he "strongly opposed" the death penalty, and that "no matter what the evidence was, [he would] ALWAYS vote [against][5] the death penalty."

---

[5] Although Prospective Juror R.D. ticked the box indicating he would always vote for the "death penalty" regardless of what the evidence showed, the remainder of his responses to questions posed in the jury questionnaire made it clear that he marked the wrong box, and instead intended to respond that he would always vote for life imprisonment. Defendant argues Prospective Juror R.D.'s erroneous box ticking, in conjunction with his other responses, "created a conflict and ambiguity which needed to be resolved through voir dire." We disagree, and conclude that Prospective Juror R.D.'s one response favorable to capital punishment resulted from a misreading of the question, not from an ambiguous position toward that penalty.

Similarly, the responses provided by Prospective Jurors M.L., J.Q., and T.T. were internally consistent, and demonstrated that the court properly excused these prospective jurors based solely upon their written responses to the questionnaire. Prospective Juror M.L. indicated that he would "probably" follow the law as the judge instructed, but that he was "not absolutely certain [he] would." He clarified, "I am strongly opposed to the death penalty," and stated he "simply would not vote for" death, and that no matter the evidence, he would "ALWAYS vote for life without the possibility of parole." Prospective Juror J.Q.'s responses to the questionnaire also unambiguously demonstrated "unwilling[ness] to temporarily set aside . . . her own beliefs and follow the law." (*People v. Avila, supra,* 38 Cal.4th at p. 531.) She explained that she was "strongly against" the death penalty, that "God alone controls our life or death," that the death penalty serves no purpose, and that she would "ALWAYS vote for life without the possibility of parole."

As in *People v. Avila,* although Prospective Juror T.T. responded "yes" when queried whether he would follow the law as instructed even if those instructions differed from his beliefs or opinions, "taken together, [T.T.'s] answers to the jury questionnaire professed an opposition to the death penalty that would prevent him from performing his duties as a juror." (*People v. Avila, supra,* 38 Cal.4th at p. 532.) Prospective Juror T.T. stated he "could not condemn a person to receive the death penalty, *under any circumstance*" (italics added), that he strongly opposed the death penalty, and that he would *always* vote for a life sentence. In light of those answers, the trial court did not err by excusing him for cause based solely upon his responses to the questionnaire.

Defendant argues that although the responses by Prospective Jurors M.G., D.F., and S.O. were not internally inconsistent, the court should have questioned them because they might have held more nuanced views regarding the death penalty than their written responses to the questionnaire suggested. We disagree. Prospective Juror M.G. expressed a view strongly against the death penalty, stating, "I am against the death penalty," "[m]y religion does not allow me to pass judgment, especially in this case," and explaining he could never vote for death because he "could not be forgiven." Prospective Juror D.F.'s responses were also unequivocally anti-death-penalty; he explained he did "not believe in taking a human life for any reason," and twice indicated his strong opposition to abortion on the same grounds. Finally, Prospective Juror S.O. consistently indicated a strong anti-death-penalty view, explaining, "I could not stand being responsible for someone's death." We conclude the court did not err by excusing these seven prospective jurors based solely on their clear and unequivocal written responses to the questionnaire.

Because we find that the court did not err, automatic reversal is not required. (*Gray v. Mississippi* (1987) 481 U.S. 648, 659–668 [95 L.Ed.2d 622, 107 S.Ct. 2045] (lead opn. of Blackmun, J.); *People v. Stewart, supra,* 33 Cal.4th at pp. 454–455.)

### 3. *Allegedly Improper Introduction of Victim Impact Evidence*

Defendant argues that the presentation of victim impact evidence at his penalty retrial violated section 190.3, Evidence Code section 352, and his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination. Specifically, defendant contends that evidence concerning the character of the victims was excessive and partially inadmissible, that testimony of the victims' children was cumulative and prejudicial, that victim impact evidence was irrelevant or inadmissible under Evidence Code section 352, and that character evidence elicited from one victim's daughter violated *Booth v. Maryland*'s prohibition against the admission of certain victim impact statements. (*Booth v. Maryland* (1987) 482 U.S. 496, 503, 508 [96 L.Ed.2d 440, 107 S.Ct. 2529], overruled in part in *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) We find no error.

Deputy Lehmann's wife testified about the impact of her husband's death on her and her children. His daughter testified about the fear she experienced as a result of her father's death. Deputy Lehmann's father-in-law spoke about Deputy Lehmann's kind nature. Deputy Lehmann's brother-in-law testified regarding the devastating impact of the officer's death on his son, Christopher, and about Christopher's destructive behavior following his father's death. Deputy Lehmann's mother testified about the heart attack she suffered just weeks after her son was killed.

Deputy Haugen's wife testified regarding her relationship with her husband, and testified as to the impact of his death on her and her children. Deputy Haugen's niece testified about her correspondence with her uncle. Deputy Haugen's son testified about grieving for his father, and the changes to his family following his father's death. Omar Rodriguez described the reaction of Deputy Haugen's family when he informed them that Deputy Haugen had been killed. In addition to the testimony described above, 57 images of the victims and their families were introduced into evidence.

 As we have repeatedly held, victim impact evidence is relevant and admissible pursuant to section 190.3, factor (a) as a circumstance of the crime so long as it is not "so unduly prejudicial" that it renders the trial "fundamentally unfair." (*Payne v. Tennessee, supra,* 501 U.S. at p. 825; see *People v. Burney* (2009) 47 Cal.4th 203, 258 [97 Cal.Rptr.3d 348, 212 P.3d 639]; see

also *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Admission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive, has repeatedly been held constitutionally permissible. (*People v. Burney, supra,* 47 Cal.4th at p. 258; *People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

Here, a few relatives of each victim testified concerning the character of the victims and the impact of their deaths upon their families. Defendant's argument that evidence regarding the victims' characters was excessive and irrelevant is unavailing. Evidence regarding the character of the victim is admissible to demonstrate how a victim's family is impacted by the loss and to show the " 'victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.' " (*People v. Brown* (2004) 33 Cal.4th 382, 398 [15 Cal.Rptr.3d 624, 93 P.3d 244], quoting *Payne v. Tennessee, supra,* 501 U.S. at p. 823.)

Though the victims' wives did testify about the impact of their husbands' deaths on their families, we reject defendant's claims that the victims' children were precluded from providing testimony regarding their personal experiences resulting from the deaths of their fathers. (See *People v. Panah* (2005) 35 Cal.4th 395, 495 [25 Cal.Rptr.3d 672, 107 P.3d 790] ["There is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members."].) Testimony provided by Deputy Lehmann's mother and daughter was similarly admissible because it was not so prejudicial that it rendered the trial fundamentally unfair. (*Payne v. Tennessee, supra,* 501 U.S. at p. 825.) Assuming without deciding that any of the victim impact testimony was erroneously admitted, any error was harmless beyond a reasonable doubt in light of the overwhelming evidence in aggravation. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

### 4. *Alleged Instructional Error Regarding Use of Victim Impact Evidence*

Defendant alleges that the trial court erred by denying his request to instruct the jury concerning victim impact evidence, and erred by failing to instruct the jury sua sponte regarding victim impact evidence, in violation of his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination.[6] We recently held in *Carrington, supra,* 47

---

[6] Defendant's requested instruction provided: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and

Cal.4th at page 198, that the trial court need not have instructed the jury sua sponte concerning the use of victim impact evidence. In *Carrington*, the defendant did not request an instruction, but argued on appeal that the court should have instructed the jury sua sponte consistent with an instruction proposed but not mandated by the Pennsylvania Supreme Court. (*Ibid.*) The defendant in *Carrington* argued that " 'raw emotion' " would taint the jury absent an instruction concerning its consideration of victim impact evidence; we rejected the defendant's argument, concluding that CALJIC No. 8.85 adequately conveyed to the jury its duty, that emotion may play a part in a juror's determination and an instruction to the contrary would be erroneous, and that an instruction explaining that the law does not deem one life more valuable than another does nothing to clarify the jury's understanding of the case. (*Carrington, supra*, 47 Cal.4th at p. 198.)

In *People v. Harris* (2005) 37 Cal.4th 310, 358–359 [33 Cal.Rptr.3d 509, 118 P.3d 545], and *People v. Ochoa* (2001) 26 Cal.4th 398, 445 [110 Cal.Rptr.2d 324, 28 P.3d 78], two cases defendant attempts to distinguish, we concluded that the trial court did not err by refusing to provide an instruction similar to the one requested by defendant here. In *People v. Harris*, we explained that the requested instruction was "unclear as to whose emotional reaction it directed the jurors to consider with caution—that of the victim's family or the jurors' own." (*People v. Harris, supra*, 37 Cal.4th at p. 359.) Defendant's requested instruction here suffers from the same defect.

Defendant argues that *People v. Harris* is distinguishable because the trial court in *Harris* provided the jury with an instruction concerning victim impact evidence requested by the prosecution, and no such instruction was provided here. In *People v. Ochoa*, however, we concluded that the jury was adequately instructed pursuant to CALJIC No. 8.84.1. (*People v. Ochoa, supra*, 26 Cal.4th 398, 455.) Just as in *People v. Ochoa*, the jury here was given an instruction broadly cautioning it to determine the facts from the evidence presented, to follow the law, and to avoid being swayed by bias or prejudice against defendant. (See CALJIC No. 8.84.1.) We have consistently concluded that neither the trial court's refusal to provide a victim impact evidence instruction worded similarly to defendant's proposed instruction, nor the trial court's refusal to sua sponte provide a similar instruction, constitutes error. Defendant presents us with no reason to reconsider our prior holdings.

---

rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy."

### 5. *Alleged Instructional Error Regarding Uncharged Acts as Aggravating Factors*

■ Defendant claims the court erred by admitting evidence of uncharged crimes as an aggravating factor under section 190.3, factor (b) without instructing the jury sua sponte that the commission of uncharged crimes under section 190.3, factor (b) must be proven beyond a reasonable doubt pursuant to *People v. Robertson* (1982) 33 Cal.3d 21, 53–56 [188 Cal.Rptr. 77, 655 P.2d 279]. Defendant correctly points out that *People v. Robertson* requires the prosecution to prove beyond a reasonable doubt the commission of uncharged crimes when introduced as a factor in *aggravation*, but defendant fails to acknowledge that a reasonable doubt instruction is not required if evidence of uncharged crimes is admitted for other purposes. (*People v. Rich* (1988) 45 Cal.3d 1036, 1121 [248 Cal.Rptr. 510, 755 P.2d 960]; *People v. Robertson, supra*, 33 Cal.3d at p. 60 (conc. opn. of Broussard, J.).)

Here, defendant claims that evidence of uncharged crimes was introduced in several ways. During his opening statement at the penalty retrial, the prosecutor explained to the jury that defendant abused his wife and had gone to jail in the past when his wife called the police. The prosecution elicited testimony from defendant's former brother-in-law that defendant had "mistreated" his wife during their marriage. During cross-examination of Dr. Verde from the Veterans Administration medical center, the prosecutor elicited testimony concerning 12 incidents of domestic violence referred to in defendant's medical records. The prosecution also elicited testimony from Pastor Young that defendant's wife stated several weeks before the shootings that defendant had threatened to shoot her. Finally, the prosecutor stated during his closing argument that defendant was abusive towards his wife.

The People argue that none of the evidence concerning domestic abuse was introduced as a factor in aggravation under section 190.3, factor (b), but instead was introduced to show defendant's intent to commit the instant crimes. This was elicited through defendant's brother-in-law's testimony concerning defendant's past statements that defendant would not be bothered by shooting a police officer. Similarly, the People claim that testimony elicited during the cross-examinations of Dr. Verde and Pastor Young demonstrated defendant's unchanging nature (presumably to show that defendant continued to believe he would not be bothered by shooting a police officer) and the likelihood that defendant would act on threats made previously, or to show a factor in mitigation, such as defendant's acting while under the influence of extreme mental or emotional disturbance.

The People rely heavily on *People v. Rich*, in which we concluded that a court need only give a *Robertson* reasonable doubt instruction " 'when

evidence of other crimes is introduced or referred to as an aggravating factor' " under section 190.3, factor (b). (*People v. Rich, supra,* 45 Cal.3d at p. 1121, quoting *People v. Robertson, supra,* 33 Cal.3d at p. 60 (conc. opn. of Broussard, J.).) The People contend that the contested evidence was introduced here for purposes distinct from proving the commission of other crimes as an aggravating factor under section 190.3, factor (b). We do not find *People v. Rich* instructive here because in that case most of the contested other crimes evidence was introduced by the defendant in the guilt phase of the trial to establish diminished capacity. (*People v. Rich, supra,* 45 Cal.3d at pp. 1121–1122.) Here, the contested evidence was introduced during the penalty retrial, and the purpose for which it was introduced was not made as clear as in *People v. Rich.*

 Nonetheless, we have concluded that a court's failure to provide a *Robertson* instruction does not constitute error where, as here, "the prosecutor did not argue that any evidence relating to . . . factor [(b)] had been presented" even when "the jury was instructed that in determining penalty it could consider, among other things, the presence or absence of criminal activity involving the use, attempted use, or threat of violence." (*People v. Lang* (1989) 49 Cal.3d 991, 1040 [264 Cal.Rptr. 386, 782 P.2d 627].) In the present case, the prosecutor argued only that section 190.3, factors (a) and (k)—circumstances of the crime and circumstances extenuating the gravity of the crime, respectively—were relevant. Accordingly, no *Robertson* instruction was required because the evidence was not introduced as evidence of uncharged crimes under section 190.3, factor (b). (See *People v. Lang, supra,* 49 Cal.3d at p. 1040; *People v. Poggi* (1988) 45 Cal.3d 306, 341 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Even if the trial court's failure to provide sua sponte a *Robertson* instruction constituted error, any error was harmless because it is not possibly probable that providing the omitted instruction would have altered the verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 446–449 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People v. Avena* (1996) 13 Cal.4th 394, 433–435 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Defendant did not argue during the penalty phase of his trial, and does not argue now, that the evidence concerning the alleged domestic abuse was inaccurate. (See *People v. Avena, supra,* 13 Cal.4th at p. 433 [uncontroverted other crimes evidence renders failure to give *Robertson* instruction nonprejudicial].) Indeed, defense counsel alluded to the domestic abuse in his own cross-examination of the People's witness, Pastor Young. Pastor Young testified that defendant's wife would call seeking counseling because she was fearful that defendant would harm her; Pastor Young also testified that defendant brought Pastor Young a gun because he wanted to "remove [it] from [his] home, because [he] want[ed] to work on [his] relationship with Elaine." Far from arguing that evidence concerning the

domestic abuse was inaccurate, defendant elicited similar testimony from the prosecution's witnesses during cross-examination. Accordingly, we conclude that the court's error, if any, in failing to instruct the jury pursuant to *People v. Robertson* was harmless because it is not possibly probable that the verdict would have been different. (*People v. Avena, supra,* 13 Cal.4th at p. 433.)

### 6. *Alleged Instructional Error Regarding Lack of Prior Felony Convictions*

Defendant requested that the jury be instructed that the absence of any prior felony convictions is a factor in mitigation. The jury was instructed, pursuant to CALJIC No. 8.85, that it must "consider, take into account, and be guided by the following factors, if applicable . . . . C, the presence or absence of any prior felony conviction other than the crimes for which the defendant has been tried in the present proceedings." Defendant alleges that the court's refusal to give a more specific instruction, stating in particular that the absence of a prior felony conviction is a mitigating factor,[7] violated section 1093, subdivision (f),[8] and his state and federal constitutional rights to due process and a reliable penalty determination. Defendant also contends that the prosecutor's argument that only section 190.3, factors (a) and (k) were relevant, and defendant's counterargument that section 190.3, factors (b) and (c) should also be considered, added ambiguity to the standard instruction, thus warranting a more specific instruction. We disagree.

We have consistently concluded that CALJIC No. 8.85 is " 'correct and adequate,' " and that no error results from a court's refusal to provide a more specific instruction informing the jury that it may consider a defendant's lack of prior felony convictions to be a factor in mitigation. (*People v. Burney, supra,* 47 Cal.4th at p. 262, quoting *People v. Valencia* (2008) 43 Cal.4th 268, 309 [74 Cal.Rptr.3d 605, 180 P.3d 351]; see also *People v. Monterroso* (2004) 34 Cal.4th 743, 788 [22 Cal.Rptr.3d 1, 101 P.3d 956] [" '[A] trial court need not instruct that the absence of prior felony convictions is necessarily mitigating,' even if the defendant requests such an instruction."], quoting *People v. Pollock* (2004) 32 Cal.4th 1153, 1194 [13 Cal.Rptr.3d 34, 89 P.3d 353].) Defendant presents us with no compelling reason to reconsider our prior holdings.

---

[7] The instruction requested by defendant and rejected by the trial court provided: "The absence of any felony convictions prior to the crime[s] for which the defendant has been tried in the present proceedings is a mitigating factor."

[8] Section 1093, subdivision (f) provides, in pertinent part, "The judge may then charge the jury, and shall do so on any points of law pertinent to the issue, if requested by either party . . . ."

### 7. Alleged Instructional Error Regarding Double Counting Special Circumstances as Aggravating Factors

Defendant argues that the trial court erroneously refused his request to instruct the jury that it "should not double count aggravating factors which are special circumstances," and that this error violated his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution. We disagree. Even if the court erred by failing to provide defendant's requested instruction, we have repeatedly held that no prejudice results from such an error where, as here, the prosecutor does not suggest that double counting aggravating factors is permissible and the jury receives the standard instruction concerning the weighing of aggravating and mitigating factors. (*People v. Melton* (1988) 44 Cal.3d 713, 774–775 [244 Cal.Rptr. 867, 750 P.2d 741]; see *People v. Ayala* (2000) 24 Cal.4th 243, 289 [99 Cal.Rptr.2d 532, 6 P.3d 193] [standard instruction does not encourage double counting of aggravating factors]; see also *People v. Burney, supra,* 47 Cal.4th at p. 267.)

### 8. Alleged Instructional Error Regarding Jury's Consideration of Circumstances of Crime as Aggravating Evidence Under Section 190.3, Factor (b)

Defendant argues that the jury was improperly permitted to consider the circumstances of the crimes as uncharged violent crimes under section 190.3, factor (b) (factor (b)) in violation of his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination. Specifically, defendant contends that evidence concerning the events leading up to the shootings of Deputies Lehmann and Haugen, which formed the basis for the additional charged crimes of assault with a deadly weapon of Brown (which was dismissed during trial) and misdemeanor spousal abuse of Elaine Russell (to which defendant pleaded no contest before trial), were improperly considered by the jury as factor (b) evidence. Defendant's claim fails.

Factor (b) permits a jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The court instructed the jury pursuant to CALJIC No. 8.85, which, with regard to factor (b), informs the jury that it may consider evidence of criminal activity "other than the crime[s] for which the defendant has been tried in the present proceedings." Here, the only evidence about which defendant complains concerns the circumstances of the charged crimes, not criminal activity other than charged crimes and circumstances surrounding them. Accordingly, defendant's claim that the jury was improperly permitted to consider evidence regarding the circumstances of the charged crimes as factor (b) evidence is

belied by the language of the instruction provided to the jury that it could only consider evidence of criminal activity other than the crimes for which defendant was being tried.

■■■ Indeed, in the present case the prosecutor informed the jury that the only relevant section 190.3 factors were factors (a) and (k)—the prosecution did not suggest to the jury that factor (b) was relevant or that it should consider the circumstances of the instant crimes as factor (b) evidence. Defense counsel argued to the contrary, informing the jury that it could "also consider factor [(b)], presence and absence of other criminal activity." Defendant complains that instructing the jury with both factor (a) and factor (b) improperly permits the jury to double count the same evidence. Defendant's claim is forfeited to the extent that he did not object to the instruction being given, and even argued to the jury that it could and should consider factor (b). (See *People v. Valdez* (2004) 32 Cal.4th 73, 113 [8 Cal.Rptr.3d 271, 82 P.3d 296]; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 390 [63 Cal.Rptr.2d 1, 935 P.2d 708], superseded by statute on other grounds as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096 [77 Cal.Rptr.3d 287, 183 P.3d 1250].) Moreover, as previously explained, the language of the instruction reveals the flaw in defendant's argument. Factor (a) permits the jury to consider the circumstances of the charged offenses, and factor (b) permits the jury to consider a defendant's violent crimes other than the crime(s) at issue in the proceeding before it. Accordingly, we conclude that a reasonable jury would not conflate or confuse the instructions concerning factors (a) and (b), and the trial court did not err by instructing the jury consistently with factor (b). (See *People v. Melton, supra,* 44 Cal.3d at p. 763; *People v. Ashmus* (1991) 54 Cal.3d 932, 998 [2 Cal.Rptr.2d 112, 820 P.2d 214], abrogated on other grounds as recognized in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Even assuming the instruction was erroneously given, no prejudice resulted because it was never suggested to the jury, or even implied, that "circumstances of the murder should be considered both under factor (a) and as criminal activity under factor (b)." (*People v. Coleman* (1989) 48 Cal.3d 112, 157 [255 Cal.Rptr. 813, 768 P.2d 32].)

### 9. *Penalty Phase Instructional Challenges*

Defendant raises a host of federal constitutional challenges to the instructions given during the penalty phase of the trial to preserve them, recognizing that this court has repeatedly rejected similar contentions. Defendant argues that the court erred by failing to instruct the jury that it must find beyond a reasonable doubt that aggravating factors outweigh mitigating factors before it imposes a sentence of death. We have repeatedly rejected this claim, and defendant presents us with no reason to reconsider our prior holdings.

(*People v. Martinez* (2009) 47 Cal.4th 399, 455 [97 Cal.Rptr.3d 732, 213 P.3d 77].) Defendant urges us to reconsider our holding in light of the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348 ] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], which we have consistently declined to do. (*People v. Martinez, supra,* 47 Cal.4th at p. 455 [" ' "[u]nlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification . . . ." ' "], quoting *People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614].) Defendant claims his Eighth and Fourteenth Amendment rights were violated because the jury was not told that it was permitted to impose death only if it were persuaded beyond a reasonable doubt that aggravating factors outweighed mitigating factors. We have repeatedly rejected this claim. (*People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970].) Defendant argues that the Sixth, Eighth and Fourteenth Amendments to the United States Constitution require that the state bear some burden of persuasion at the penalty stage, which the jury instructions failed to provide. We have consistently rejected this contention. (See *People v. Manriquez, supra,* 37 Cal.4th at p. 589.) We similarly reject defendant's claims that the penalty phase instructions were constitutionally deficient because they did not mandate juror unanimity concerning aggravating factors (*People v. Martinez, supra,* 47 Cal.4th at p. 455), and we reject defendant's claim that the jury should have been instructed regarding a " 'presumption of life.' " (*People v. McWhorter, supra,* 47 Cal.4th at p. 379.)

### 10. Alleged Instructional Error Regarding Scope of Jury's Sentencing Discretion and Nature of Deliberative Process

Defendant argues that the concluding instruction given to the jury, a modified version of CALJIC No. 8.88, was flawed because it failed to adequately convey deliberative principles, was misleading and was vague.[9]

---

[9] The instruction read to the jury provided: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant. [¶] After hearing—after having heard all of the evidence and having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences which is above and beyond the elements of the crime itself. [¶] A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignments of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances you

Defendant contends these defects violated his rights to due process, a fair trial by jury, and a reliable penalty determination under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Not so.

Defendant argues that the phrase "so substantial" in the final paragraph of the instruction—that jurors may return a verdict of death if each is "persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it warrants [a judgment of] death" (italics added)—created a vague and directionless standard in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We disagree. As an initial matter, we note that defendant did not request a clarifying instruction; accordingly, any objection he has to the instruction is forfeited. (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Defendant's claim also fails on the merits. We have consistently held that the "so substantial" language in CALJIC No. 8.88 "is not inadequate or misleading. By advising that a death verdict should be returned only if aggravation is 'so substantial in comparison with' mitigation that death is 'warranted,' the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty." (*People v. Arias, supra*, 13 Cal.4th at p. 171; see also *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

Defendant next contends that the instruction's use of the term "warrants" was inadequate because jurors are called upon to decide whether death is the "appropriate" penalty, not whether it is warranted. We rejected an identical argument in *People v. Breaux*, concluding that the "contention is spurious." (*People v. Breaux, supra*, 1 Cal.4th at p. 316; see also *People v. Friend* (2009) 47 Cal.4th 1, 90 [97 Cal.Rptr.3d 1, 211 P.3d 520] ["The phrases 'so substantial' and 'warranted' in CALJIC No. 8.88 are not unconstitutionally vague."].) Finally defendant suggests that the instruction was inadequate because it failed to convey to the jury that it must impose a life sentence if it did not find that aggravating factors outweighed mitigating factors. We have consistently concluded otherwise. (*People v. Friend, supra*, 47 Cal.4th at p. 90; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

11. *Alleged Instructional Error Regarding Section 190.3*

Defendant raises numerous challenges to the jury instructions concerning section 190.3 (CALJIC Nos. 8.85, 8.88, as given), all of which this court has

---

determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole."

repeatedly rejected. Defendant first contends that section 190.3, factor (a) violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the "circumstances of the crime" factor is applied in "a wanton and freakish manner" resulting in arbitrary and capricious imposition of the death penalty. We have previously considered and rejected this claim. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 831 [89 Cal.Rptr.3d 225, 200 P.3d 847].) Defendant next contends that the trial court erred by failing to delete inapplicable factors from CALJIC No. 8.85 as provided to the jury; we have consistently concluded otherwise. (*People v. McWhorter, supra,* 47 Cal.4th at p. 378.) We have also consistently rejected the claim that the failure to instruct the jury as to which factors were mitigating constituted error. (*Ibid.*) We have likewise repeatedly rejected the claim that adjectives such as "extreme" and "substantial" act as a barrier to the jury's consideration of factors in mitigation. (*Id.* at pp. 378–379.)

Defendant also argues that the failure of CALJIC Nos. 8.85 and 8.88 to require written findings deprived him of his rights to due process, meaningful appellate review, and equal protection pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. We have consistently concluded otherwise. (*People v. Geier* (2007) 41 Cal.4th 555, 620 [61 Cal.Rptr.3d 580, 161 P.3d 104].) Finally, defendant erroneously suggests that California's death penalty scheme denies capital defendants equal protection of the laws; we have repeatedly concluded to the contrary. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 831; *People v. Zamudio* (2008) 43 Cal.4th 327, 373 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

### 12. *Intercase Proportionality Review*

Defendant argues that the California capital sentencing scheme's lack of intercase proportionality review violates his rights to be free from the arbitrary and capricious imposition of a capital sentence pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. We have repeatedly rejected similar claims, and are presented with no arguments compelling us to alter our long-standing rule. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 833; *People v. Hoyos* (2007) 41 Cal.4th 872, 927 [63 Cal.Rptr.3d 1, 162 P.3d 528].)

### 13. *Cumulative Error*

Defendant argues that even if individual errors do not warrant reversal, the cumulative effect of multiple errors resulted in prejudice to defendant mandating reversal. We disagree. To the extent we concluded or assumed that the trial court erred, no single error warranted reversal, and we are not persuaded that reversal is warranted when those same nonprejudicial errors are considered collectively.

14. *Alleged Violation of International Law, and of the Eighth and Fourteenth Amendments to the United States Constitution*

Defendant's final contention—that his death sentence and California's capital sentencing scheme are inconsistent with international norms, and therefore violate the Eighth and Fourteenth Amendments to the United States Constitution—has been repeatedly rejected by this court. (*People v. Curl* (2009) 46 Cal.4th 339, 362–363 [93 Cal.Rptr.3d 537, 207 P.3d 2].)

## III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—The court's opinion, which I have signed, states that the waiting and watching required to support a first degree murder conviction on a lying-in-wait theory need not continue for any particular length of time. For this reason, it rejects defendant's argument that the trial court should have instructed the jury that the period of waiting and watching must be substantial. (Maj. opn., *ante*, at pp. 1242–1245.) I agree.

I write separately to explain why my concurrence here does not conflict with my concurring and dissenting opinion in *People v. Stevens* (2007) 41 Cal.4th 182, 214 [59 Cal.Rptr.3d 196, 158 P.3d 763] (*Stevens*). There, I expressed the view that a period of waiting and watching must be substantial. But in *Stevens* I was addressing lying in wait as a special circumstance (Pen. Code, § 190.2, subd. (a)(15)) rather than, as here, lying in wait as a form of first degree murder.

As I explained in *Stevens*, California's death penalty law, which the voters enacted in 1978, contains a list of special circumstances that make a first degree murder punishable by death. (Pen. Code, § 190.2, subd. (a).) The list includes lying in wait, but not premeditation and deliberation. In this way, the provisions of our death penalty law reflect a determination by the voters that lying-in-wait murder is "more heinous than premeditated murder." (*Stevens*, *supra*, 41 Cal.4th at p. 215 (conc. & dis. opn. of Kennard, J.).) Thus, I concluded, the voters must have intended that the lying-in-wait special circumstance be defined "in a manner that differed significantly from premeditated murder." (*Ibid.*)

To make that important distinction, I concluded that the waiting and watching required to support the lying-in-wait special circumstance must

continue for a substantial period of time. (*Stevens*, *supra*, 41 Cal.4th at p. 215 (conc. & dis. opn. of Kennard, J.).) Because the issue defendant raises here concerns lying in wait as a form of first degree murder, and not as a special circumstance, there is not the same need to distinguish defendant's crime from other premeditated and deliberate murders. Indeed, this court has held that, for establishing that a murder is of the first degree, "proof of lying-in-wait" is "the functional equivalent of proof of premeditation, deliberation and intent to kill." (*People v. Ruiz* (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854].) In other words, submitting evidence of lying in wait is merely one of several ways of establishing premeditation and deliberation. Therefore, I join in the court's opinion that, for purposes of establishing the degree of a murder, waiting and watching need not continue for any particular length of time. (See *People v. Moon* (2005) 37 Cal.4th 1, 23 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

Appellant's petition for a rehearing was denied December 21, 2010, and the opinion was modified to read as printed above. George, C. J., and Werdegar, J., did not participate therein.