Filed 5/25/21  P. v. Ramos CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046895 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 16CR08320) |
| v. | |
| JOSE LUIS RAMOS, | |
| Defendant and Appellant. | |

Defendant Jose Luis Ramos was convicted by a jury of first degree premeditated murder (Pen. Code, § 187, subd. (a))[1], attempted murder with premeditation (§§ 187, subd. (a), 664), and shooting at an occupied vehicle (§ 246).  The jury also found true allegations that he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)) in the commission of the attempted murder and shooting counts and that he personally and intentionally discharged a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d)) in the commission of all three counts.  The court imposed a sentence of 90 years to life, which included a term of 15 years to life for the attempted murder count.

On appeal, defendant contends that the trial court prejudicially erred in offering the jury additional closing arguments after deliberations had begun and by thereafter permitting the parties to give additional closing arguments over defense objection.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We reject this contention. Defendant also asserts, and the Attorney General concedes, that the term imposed for the attempted murder count was unauthorized. We accept the concession, reverse the judgment, and remand with directions to correct the term imposed for the attempted murder count.

## I.    THE PROSECUTION'S CASE

Maria Elena Rocha and defendant married in 2004 and had four children together. Their relationship was always "full of jealousy." Defendant "was always threatening" to "hurt himself" and, if he found her with another man, to "kill both of [them]." Rocha thought his threats were "just all drama."

Rocha first filed for a divorce in 2010, but she abandoned her divorce action after defendant promised "he would be better." He was better for only a few months. By 2015, defendant had become even "more possessive." He "wanted to know who [Rocha] was with and where [Rocha] was." Defendant also started using drugs. The last straw for Rocha was when he bought drugs with the money they needed to pay the rent.

In February 2016, she again filed for divorce, and the divorce became final in October 2016. Defendant stopped living in Rocha's Watsonville home in May 2016, though she still saw him when he visited their children. Even after he stopped living there, defendant sometimes showed up in Rocha's home in the night and woke her from her sleep. Rocha had her home's locks changed three or four times between May and December 2016, but defendant kept getting into her house. Defendant wanted to get back together with Rocha, and he constantly asked her if she was seeing someone else. She told him that she was not seeing anyone. Nevertheless, defendant repeatedly told Rocha that he "would kill [them]" if he saw her with another man.

Rocha worked in Soquel and started work at 3:30 a.m. Rocha's mother took care of the children while Rocha was at work. Santiago Avalos was one of Rocha's coworkers. In late September or early October 2016, Rocha and Avalos began talking to each other frequently, became "more than friends," and sometimes kissed each other even

though he was married.  They never went out on a date, and the only place they spent time together outside of work was at a dirt parking area on North Rodeo Gulch in Soquel, two minutes away from their workplace, where they would meet up after work.  They usually spent about an hour together at the dirt lot because they both had to leave then to pick up their kids.

In October 2016, Rocha and the children were at a restaurant in Gilroy when defendant suddenly appeared.  When she sent him the final divorce papers, he made a point of letting her know that he had shredded them.  In November 2016, Rocha found defendant hiding behind her couch in her living room.  He told her that he had a knife and a bat, showed her the bat, and told her that he " 'was going to kill [her], but I didn't do it because I thought of my children'."  After the couch incident, Rocha had the locks to her home changed yet again.  On November 26, 2016, defendant texted Manuel Cadenas, Rocha's brother-in-law, saying "I need a gun" and "[j]ust between us."

On December 1, 2016, defendant telephoned Rocha's employer, said that his ex-wife, Rocha, was having an affair with her supervisor, and suggested that they should both be fired.  Avalos was not Rocha's supervisor.  Rocha's employer determined that defendant's allegation was false.

On December 3, 2016, defendant installed a GPS tracking application on his cellphone.  On December 6, defendant contacted a locksmith, claimed to have lost his keys, and asked the locksmith to "pick the locks" on Rocha's home.  Rocha's landlord intervened and stopped the locksmith, telling him that defendant "is not allowed here." On December 7, defendant texted Cadenas again:  "I was going to get a 9, but then I have to throw it away and it's expensive."  He also texted Cadenas:  "That was a sure shot, no going back."  Also on December 7, defendant took a cellphone photo of Blazer ammunition.

Throughout the week prior to December 12, 2016, defendant lurked near Rocha's home and her parents' home many times a day, often in the night.  On December 9, he

3

took a cellphone photo of Rocha's car. On December 10, defendant began using the GPS tracking application on his cellphone to track the location of a cellphone he had surreptitiously concealed on Rocha's car. The battery pack that powered the concealed cellphone had been purchased on December 8. The GPS tracking application notified defendant every time Rocha's car left her home or workplace.

On December 12, 2016, Rocha left work in her car at 1:30 p.m. to meet Avalos at the dirt lot on North Rodeo Gulch. They parked their cars next to each other, Rocha got into the passenger seat of Avalos's car, and they talked and kissed for a while. At 1:58 p.m., the GPS tracking application notified defendant of Rocha's location at the dirt lot on North Rodeo Gulch. Defendant left his home in Watsonville a few minutes later and headed for the dirt lot.

At 2:20 p.m., Rocha decided to leave because Avalos seemed to be focused on his cellphone rather than talking to her. As Rocha was about to get out of the car, she dropped her keys by her feet. She bent down to retrieve them, and when she sat back up she saw defendant's "hand shooting" Avalos.[2] Defendant had not said anything at that point, but he had opened the front passenger door and extended his gun in front of Rocha's face. He then turned the gun on her. Rocha unsuccessfully tried to remove the gun from defendant's hand, and he shot her in the stomach. She got out of the car, held onto defendant's wrist, and struggled with him over the gun. He freed his hand from her grasp and shot her again in the stomach. Rocha told him "don't do it," and he replied "I told you not to do it." She understood this to be a reference to his admonition that she not go out with anybody else. Rocha fell to her knees, and defendant, who was standing behind her, shot her in the back. After that, Rocha heard defendant pull the trigger one more time, but there was just a clicking sound. No more bullets fired. She saw him run

_____

[2] Prior to trial, Rocha had told law enforcement that defendant began shooting from Avalos's side of the car and had said to her " 'I told you if I saw you with somebody else I'm gonna kill you.' "

4

away. Avalos's car moved backwards in reverse with the passenger's side door open, spun around in the street, bounced off of a parked car, and only stopped when it hit a sign.

A nearby business owner heard several shots followed by a pause of a few seconds and then two or three more shots. He saw defendant driving away from the scene very fast and running through a red light. A woman who was driving by saw defendant with a gun in his hand, which was inside the car. She also saw him put the gun in his pants, run to a car, and drive away. The woman called 911.

When law enforcement arrived, Avalos was dead and slumped over in the driver's seat of his car with blood coming out of his head. Avalos had a bullet wound to the top of his head that would have caused immediate unconsciousness and "death soon after that." He had another bullet wound to his shoulder and chest. His wounds were consistent with Avalos possibly bending down and facing the shooter when he was shot.

Rocha had bullet wounds to her chest, pelvis, buttocks, and back that had been caused by at least three bullets. Bullets had penetrated both of her lungs, and she had injuries to her liver and small intestine. She would have died within 30 minutes without immediate surgery, and she was hospitalized for 11 days after surgery.

Two bullets were recovered from Avalos's body. No bullets were found in Rocha's body. A bullet fell out of her bra as she was being treated at the scene. Three Blazer .380-caliber casings were found in Avalos's car, and a fourth Blazer .380-caliber casing and a spent bullet were found on the ground nearby. A fifth Blazer .380-caliber casing was found nearby. A bullet hole was found in the driver's side panel of Avalos's car, and a bullet was found inside the driver's side door.

Before Rocha was transported to the hospital, she told law enforcement that defendant was the person who had shot her and Avalos. Law enforcement tried to locate defendant's cellphone, but no location information was available for his cellphone from

5

5:00 p.m., when information was first sought, until 9:00 p.m.[3] At about 9:30 p.m., defendant's cellphone was tracked to a location in Soquel not far away from the scene of the shooting. After an intensive search, defendant was located at 11:00 p.m. lying behind a wall near a taqueria with his cellphone in his hands. He was wearing four layers of clothing, including two t-shirts, a jacket, and a hooded sweatshirt.

A "gun-shaped" object was found a foot from defendant's feet. The gun-shaped object was a handgun that had been placed inside two rubber gloves and wrapped in duct tape. The handgun's two safeties were both off. No ammunition was in the gun or in its attached magazine. Defendant's fingerprints were found on the duct tape wrapped around the gun and on the gun's magazine. The gun was a semiautomatic pistol with no mechanical issues; it required a normal amount of trigger pull and was unlikely to accidentally discharge. The bullets and cartridges recovered from the scene and the bullets recovered from Avalos's body had been fired by this gun.

Law enforcement found the concealed cellphone on Rocha's car that defendant had used to track her car. The car defendant had driven away from the scene of the shooting was found about 200 yards from the taqueria. A metal box containing 43 cartridges of Blazer .380-caliber ammunition was found in a bag in the trunk of the car. A search of defendant's bedroom turned up a backpack containing an empty box of .380-caliber handgun ammunition.

When he was interviewed by law enforcement after his arrest, defendant initially told them that he had no involvement in the shooting but then asserted that, due to his drug use "and there's something wrong with my head," "sometimes I do things that I forget."

---

[3] An examination of defendant's cellphone revealed that defendant had manually deleted his location history and repeatedly turned his cellphone off and on after the shooting, which prevented its location from being tracked.

## II.   THE DEFENSE CASE

The black sweatshirt that defendant was wearing when he was arrested had a couple of holes in the front of it.  The defense's forensics expert testified that two of these holes were bullet holes.  He opined that one of the holes bore indications that a firearm had been in loose contact with the fabric when it fired, while the other one reflected that a firearm had been tightly up against the fabric when it fired.  The defense expert testified that the bullet holes went through both the interior of the sweatshirt and the front pocket of the sweatshirt and that they had originated from inside the sweatshirt, not from inside the sweatshirt's pocket.

Defendant testified on his own behalf.  He denied intending to kill anyone when he arrived at the dirt lot on North Rodeo Gulch.  He denied intending to fire the gun or to kill anyone at any point.  He also denied ever threatening to kill Rocha.  Defendant testified that he believed that Rocha was dating a member of a Watsonville gang called CML and that the members of this gang were dangerous and "crazy" people who carried guns, wore loose clothing, and associated with the color red and Norteños.  Defendant also testified that Rocha's brother-in-law, Manuel Cadenas, was a gang member.

Defendant admitted entering Rocha's house in the middle of the night in late November 2016, and he testified that he did so because he saw Rocha enter the house with a man he believed was a gang member due to his loose clothing and the way he walked. Defendant testified that while he was lurking inside the house he heard Rocha tell the man to kill him, heard a gun being loaded, and heard knives being taken out. Defendant testified that this incident led him to believe that he and his children were in danger.  After one of his car windows was smashed a few days later, he bought a gun from a friend "[t]o protect [him]self and for [his] safety."  He testified that his texts to Cadenas were intended to let Rocha "know that [he] had something to defend [him]self with."

7

Defendant admitted that he tracked and followed Rocha, and he testified that he did so because he "wanted answers" about her "new boyfriend" and "who was going to be caring for my children." He admitted that he often waited outside Rocha's house or her parents' house in the middle of the night, which he explained he did because he had "nothing else to do." Defendant admitted that he broke into Rocha's house on December 8, 2016 when she was not there.

Defendant testified that he immediately went to the dirt lot on North Rodeo Gulch on December 12, 2016 with a loaded gun as soon as his tracker application told him that Rocha's car was there, believing that Rocha would be there with her new boyfriend. When he arrived at the dirt lot, he saw Rocha "kissing her boyfriend." Defendant adamantly denied that he was "angry" when he saw this, and he testified that he just "wanted to talk to her and her boyfriend" about "the children."

On direct examination, defendant testified that he put his gun in the pocket of his sweatshirt. However, on cross-examination, he insisted that he had the gun in his pants, underneath his sweatshirt. Defendant testified that when he approached Avalos's car, Rocha opened the door and got out. He told her that he wanted to talk to her, but she shouted "no, no" and "started hitting [him]." Defendant saw that Avalos, whom he had never seen before, was wearing a red shirt and "was bending over trying to get something from underneath the seat." Defendant concluded that Avalos was a gang member and was reaching for a gun.

Defendant did not claim that he acted in self defense. Instead, he testified that he "heard shots" and "didn't know if they were coming from [his] own gun or from somewhere else." He thought Avalos was shooting at him. Defendant testified that he "didn't realize" that he had his gun "in hand already" and "didn't try to take it out." But he also testified that he "had [his] hand inside already" with his finger on the trigger. Defendant testified that when Avalos's car started moving in reverse, the open passenger's door hit him and Rocha, knocking them down with defendant on top of

Rocha. After being knocked down, he got up and realized that Rocha had been shot. He "saw blood on her" and immediately fled. Although he conceded that his gun fired five times, defendant testified that he "never" intentionally pulled the trigger and all of these shots were accidental firings. He admitted that the gun had no ammunition left in it after the shooting.

## III. PROCEDURAL BACKGROUND

The jury was instructed with CALCRIM No. 521 on first degree murder: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death." "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

The court's instructions to the jury on attempted murder required the jury to find that defendant "intended to kill that person" in order to convict him of attempted murder. The court instructed the jury with CALCRIM No. 601 on the premeditation allegation attached to the attempted murder count. CALCRIM No. 601 used the same language as CALCRIM No. 521 to describe willfully, deliberately, and with premeditation.

9

Closing arguments occurred after the jury was instructed. The prosecutor argued that defendant's text messages to Cadenas after he bought the gun demonstrated that he did not intend to use the gun for self defense. "He knew what he was planning to do." "The only way for him to know that he was going to have to toss it and that there was no going back was that he planned the whole thing. He deliberated the whole thing. He orchestrated the whole thing. That was his plan from the beginning." The prosecutor argued that defendant's purpose for installing the tracker on Rocha's car was to "ambush" her. He contended there was just one question for the jury: "Was it an accident, or was it willful, deliberate, premeditated murder and attempted murder."

The prosecutor argued to the jury that "[d]eliberate does not mean it was a good decision [o]r that the defendant fully understood all of the implications, just that he thought about it before he made that decision, and he made that decision to act knowing what some of the consequences could be." He argued that the evidence supported premeditation because defendant (1) bought "an untraceable firearm," (2) put a tracker on Rocha's car, (3) went to the dirt lot to which he had tracked her, (4) shot Avalos both in the head and elsewhere, and (5) shot Rocha three times, including once in the back. The prosecutor also relied on defendant's actions after the shooting, which he asserted showed that defendant made careful decisions aimed at covering his tracks, demonstrating that defendant was in a "very, very active thinking mode." "[A]ll of this behavior is so deliberate. [¶] All of this behavior is so calculated . . . ."[4]

Defendant's trial counsel relied on defendant's testimony in arguing to the jury that defendant "can't even get his gun untangled from his sweatshirt before it starts going off." She argued that Rocha "lied" about everything and that defendant "told you the truth." Defendant's trial counsel contended that defendant was not guilty of any of the

---

[4] The prosecutor's rebuttal argument was similar. He maintained that premeditation was shown by "the way he purchased the gun," "the text messages that he sent out, and the way he carried through his plan."

charged offenses because he "didn't intend to shoot" and "never intended to kill" Rocha. She argued that "[a]n accident is not murder," and "[a] mistake is not murder." She also argued that the prosecution's firearms expert had not ruled out accidental discharges. Her position was: "No premeditation, just a reaction. . . . Just a terrible mistake."

The jury began deliberating at 11:28 a.m. on March 5, 2019. At 2:05 p.m., the jury requested a readback of the testimony of the prosecution's firearms expert. The readback was scheduled for the next morning, and the jury continued deliberating until 4:30 p.m. The next day, March 6, the jury submitted multiple inquiries.[5] The first one referenced the attempted murder instruction (CALCRIM No. 600) and asked "what is the definition of a plan." The court responded by rereading the attempted murder instruction to the jury and telling the jury that "[t]he word plan as used in this instruction is not specifically defined in the law. . . . [T]he plan in this allegation is a plan to kill."

The next inquiry from the jury on March 6, 2019 asked: "What is the legal definition of premeditation?" Outside the presence of the jury, counsel agreed that the court should simply refer the jury back to the instructions, CALCRIM Nos. 521 and 601. The court suggested that "[a]nother possibility is allowing the attorneys to argue for a few minutes, premeditation, so they can fill in the blanks as to what they believe premeditation is." Defendant's trial counsel replied: "I would prefer not [to] do that, but I will—whatever you want me to do I will do." The prosecutor suggested that the court "inquire if they want further argument if that would be helpful."

This colloquy then occurred: "THE COURT: Do you want me to ask that question before I ask. Because if I ask it and they say, yes, I will give you some time to

---

[5] During deliberations on March 6, 2019, one of the jurors asked if it would be possible for her to leave at 1:00 p.m. on March 7 to pick up her elderly father at the airport. When a delay had occurred earlier in the trial, the court had asked the jurors to let him know if this created a problem for any of them. The court decided to talk to the juror and find out more. When the court did so, it learned that she just needed the afternoon off, and the court granted her request.

argue what premedition is. Do you want to ask that question, Mr. Baum [the prosecutor]? [¶] MR. BAUM: Yes, I would. [¶] THE COURT: Ms. Rogers [defendant's trial counsel]? [¶] MS. ROGERS: I would prefer not, and my reasoning is is [*sic*] that argument about the legal meaning of premeditation, I don't see how it would be appropriate. We both argued the facts in our case very thoroughly, and at this point they need to apply the facts to the legal definition. I don't think it would be appropriate for us to get up there and tell them what we think it means. Legally, I think it's a fact-based determination that they have to apply to the instruction."

The court then brought the jury in and told it that "[t]here is no additional legal definition in the law that I can give to you." It directed the jury back to the instructions, CALCRIM Nos. 521 and 601. The court also told the jury: "So keep working on that. Another possibility would be that the attorneys could be given a few minutes to argue that area of the law for you if they wanted to and give them five or ten minutes to argue that. We are not going to do that today. If we do that it will be -- we could probably do it tomorrow morning at some time. [¶] I have to look at my calendar and talk to the lawyers about that, but talk amongst yourselves right now and see if that's something the group wants to give the attorneys five or ten minutes to argue that or no, do it on our own. So give me an answer to that." The jury responded immediately: "We all agree to have the attorneys argue." The court then told the jury: "Okay. So I will talk with them about that and see what time we will be able to do it tomorrow. You won't be in session tomorrow afternoon, so go back and continue your deliberations, and again, thank you very much. I know this is not easy work. You are working hard, and I appreciate that. So continue with your deliberations."

Outside the presence of the jury, the court acknowledged the defense objection to additional argument and asked defendant's trial counsel to produce "[a]ny evidence to argue that the Court doesn't have authority" to allow additional arguments. The court asked counsel how much time they would want for additional arguments, and the

prosecutor requested 15 minutes. Defendant's trial counsel also requested 15 minutes. The court tentatively proposed that the additional arguments would occur the next morning at 10:00 a.m. but permitted defendant's trial counsel time to establish that her objection was valid.

The jury sent out another message later that afternoon: "We ask for the lawyers to argue what it means to 'carefully weigh the co[n]sideration[s] for or against his choice' during the alleged act. What does it mean to know the consequences?" The court told the attorneys, outside the presence of the jury: "We will need a little more information as to what it is that they would like further clarification on . . . " The court then recessed for the day.

The next morning, March 7, 2019, the court met with counsel outside the jury's presence and explained that "[f]urther review of the law" showed that additional argument "is permissible, but there's an indication that that should be done only when the jury reaches an impasse." The court told counsel: "So at this point I will inform the jury that the attorneys will not be arguing. I will also inform that it will be an option if they are at some point unable to continue with their deliberations. Any other input on that?" The prosecutor said that "my impression was that they had reached an impasse, but perhaps the Court could inquire." The court responded: "Yes. Anything else on that issue?" Defendant's trial counsel responded: "No."

The court called in the jury and told it: "We needed some clarification as to where you are in your deliberations. Are you at an impasse? Which means you are unable to continue your deliberations, or are you still deliberating and making progress?" The jury responded: "We are currently still deliberating. There's progress being made. The main thing is on the idea of premeditation." The court replied: "Understanding that the law allows the Court to take action when you are at an impasse, which could include having the attorneys argue with you. Since you are not there, we are not going to go to the next step, but if you inform me that you are at an impasse then I can allow other options,

13

including allowing the attorneys to argue further on points of the law so because you are not there yet I am not going to jump to the next step." The court told the jury to return to its deliberations.

The jury then sent the court another message: "We are at an impass [*sic*] with regards to premeditation to Counts one and two. [¶] We also request clarification on 'deliberately' under 521 in th[e] instructions." The court told counsel that it had decided that "at this point I will allow the attorneys time to argue those points." The prosecutor requested 15 to 20 minutes, and defendant's trial counsel stated that she "will be well under 20 minutes." The court then called the jury in and permitted the attorneys to present additional arguments.

The prosecutor argued first. He based his argument on the instructions and pointed out that the jury was not required to find that defendant "made a good decision" but only that "he thought about it and he made a decision to kill." The prosecutor reiterated the facts that he believed supported premeditation. Defendant had purchased "an untraceable gun on December 3rd" that cost him "a good chunk of money" even though he was jobless and living on a mattress on the floor of a rented room. His text messages stating that he would have to toss the gun, that it was a "sure shot," and that there was "no going back" were inconsistent with his claim that he bought the gun for self-defense. His stalking behavior suggested that he "was hunting his ex-wife and her new boyfriend." Defendant's planting of the tracker on Rocha's car also suggested that he was trying to "catch her" at "just the right moment." His immediate travel from Watsonville to the dirt lot upon learning her location also indicated that he had a plan. The fact that he brought a gun reflected a plan to kill. The prosecutor told the jury that "[t]he test is the extent of the reflection, not the length of time."

The prosecutor also pointed out that defendant had testified that the gun was in his waistband, and the prosecutor asserted that this meant that the two safeties had been on at that time. He argued that defendant had to not only draw the gun out of his waistband but

14

also disengage both safeties before firing it, which necessarily required deliberation. "He had to draw. He had to release the safeties. He had to aim at Santiago [Avalos] and shoot Santiago twice. Each action is very deliberate." "Think about how many steps he had to go through." The prosecutor emphasized the "pause" between the shots at Avalos and the shots at Rocha and the fact that defendant shot Rocha in the back. The prosecutor also emphasized that all five shots had hit their targets, which he argued showed deliberation.

Defendant's trial counsel argued that the facts did not show that defendant was a "cold, calculated killer" but "[a] human being who made mistakes" and had "no plan." She contended that defendant's "sweatshirt proves there was no plan . . . ." Defendant's trial counsel stuck to her argument that defendant "never intended to pull the trigger." As to premeditation, she argued that it was like the jury's deliberations. "You have premeditated. You have deliberated. You have weighed the consequences. You have thought this through. And what you are left with is questions. What you are left with is doubt. Every single question that you have jotted down and brought to the bailiff and brought to us is a doubt." "[W]hen you have this many questions about something this important you have doubt."

At this point, the court asked counsel to approach, and it told defendant's trial counsel at sidebar that she was "misleading the jurors" because it was "not a correct statement of the law" that the jury's questions established the existence of doubt. "So move on to something different." "The focus was on premeditation and deliberation." The court then told the jury that defendant's trial counsel "will refocus her argument." She quickly concluded her argument, and the jury resumed its deliberations.

Outside the presence of the jury, defendant's trial counsel made a record of her objection to the trial court's action during her argument. She disagreed with the court's conclusion that it was "inappropriate for me to say that [premeditation is] akin to what the jury does when they deliberate." The court defended its actions. "Well, I let that one

15

go.  You are arguing that 12 people deliberating for several days is what they need to find to find premeditation and deliberation.  I let that one go.  But when you argue that every time they ask a question, that's expressing reasonable doubt and they have reasonable doubt, you are going outside the parameters that I allowed, and I was very clear you can argue premeditation and deliberation.  You took that extra opportunity to argue something different that that is not a correct statement.  [¶]  I want the jury to ask questions, and the fact that they ask questions is certainly not at all connected to them having any sort of doubt in this case."

The jury continued deliberating until 1:00 p.m. that afternoon.  During those deliberations, the jury sent an inquiry to the court.  The inquiry read:  "We are split on the Special Allegation for Count 2 (Willfull . . . .)  We request instruction on how this effects [*sic*] the rest of the count."  This inquiry was sealed until the next morning, and the court had not yet unsealed it when the jury announced that it had reached verdicts.  When the jury was brought in, the court asked about the inquiry, and the jury told the court that it did not need any response to that inquiry.

The jury proceeded to return its verdicts, which occurred at 10:20 a.m. on March 8, 2019.  The jury found defendant guilty on all three counts and found all of the allegations true.  The verdict forms had all been completed and signed on March 6 except for the first degree murder verdict, which was dated March 7, and the jury's finding on the premeditation allegation attached to the attempted murder count, which was dated March 8.  The court imposed a sentence of 90 years to life, which included a 15-years-to-life term for the attempted murder count.[6]  Defendant timely filed a notice of appeal.

---

[6] The 15-years-to-life term had been recommended in the probation report.

## IV.    DISCUSSION

### A.    *Additional Closing Arguments*

Defendant contends that the trial court prejudicially erred in permitting counsel to present additional closing arguments, over defense objection, after the jury had begun its deliberations.  He specifically claims that the court erred in (1) "*offering* additional argument" to the jury *before* the jury had reached an impasse, (2) allowing the prosecutor to use the additional argument time to reargue the facts and the instructions, and (3) cutting off defendant's trial counsel's argument "on the meaning of deliberation." (Italics added.)

"Courts must exercise care when intruding into the deliberative process to ensure that the secrecy, as well as the sanctity, of the deliberative process is maintained." (*People v. Russell* (2010) 50 Cal.4th 1228, 1251.)  Nevertheless, when a jury is at an impasse, the court may in its discretion permit further argument by counsel so long as the court does nothing "coercive."  (*People v. Young* (2007) 156 Cal.App.4th 1165, 1171.) "After a jury reports that it has reached an impasse in its deliberations, . . . [t]he judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict.  [¶] . . . If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may[,]" among other things, "[p]ermit attorneys to make additional closing arguments."  (Cal. Rules of Court, rule 2.1036.)

Defendant claims that the court *coerced* the jury by telling it, *before* the jury had told the court that it had reached an *impasse*, that additional arguments were an option and then telling the jury that additional arguments were not an option unless the jury was at an impasse.

Although defendant claims otherwise, the record reflects that the jury had been deliberating for approximately a full day before it asked the court for a definition of premeditation.  The court and counsel agreed that there were no additional instructions defining premeditation that could be provided to the jury.  When, outside the jury's

presence, the court mentioned the possibility of additional arguments, the prosecutor suggested that the court first ask the jury if the jury thought additional arguments would be helpful. Defendant's trial counsel objected to additional arguments because she thought it was not "appropriate for us to get up there and tell them what we think [premeditation] means." "I think it's a fact-based determination that they have to apply to the instruction." Because defendant's trial counsel had adhered to defendant's testimony that the shootings were accidental, she had not significantly addressed premeditation in her closing argument to the jury.

The court brought the jury in and, as the parties had agreed, told the jury that "[t]here is no additional legal definition in the law that I can give to you," referred the jury back to the instructions, and told the jury to "keep working on that." After providing this response to the jury, the court told the jury that there was a "possibility" of additional arguments, which it told the jury could occur only after the court "talk[ed] to the lawyers about that." The court asked the jury if additional arguments were "something the group wants," and the jury responded that it "agree[d] to have the attorneys argue." The court told the jury "I will talk to them about that and see what time we will be able to do it tomorrow" and asked the jury to "continue with your deliberations." The jury then sent a message to the court specifying that it desired additional arguments addressing the instructional language defining "deliberately."

The court subsequently decided that additional arguments were permitted only if the jury was at an impasse, asked the jury if it was at an impasse, and was told by the jury that it was not at an impasse. It was at this point that the court told the jury "if you inform me that you are at an impasse then I can allow other options, including allowing the attorneys to argue further" and told the jury to return to its deliberations. The jury thereafter told the court that it was at an impasse on premeditation and desired "clarification on 'deliberately' under 521 in th[e] instructions."

18

Defendant contends that the jury was under "pressures to reach a verdict" because the trial had been delayed. He relies on the fact that one juror needed an afternoon off to pick up her elderly father at the airport. Since the court and counsel agreed that the jury would not deliberate that afternoon so that she could do so, that circumstance did not place pressure on the jury to reach a verdict. He also claims that the court's offer of additional arguments in and of itself pressured the jury to reach a verdict. Nothing in the record supports this claim. The court had instructed the jury previously: "You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have a discussed the evidence with the other jurors." The court's offer of additional arguments, which it explicitly told the jury could not occur until another day, did not suggest a focus on speeding the deliberations to a close. We reject defendant's claim that the jury was under any improper "pressures to reach a verdict."

The record contains no indication that the jury was coerced by the trial court's actions. "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265.) Here, the jury had already let the court know that it was having difficulty with the concept of premeditation before the court first mentioned the "possibility" of additional arguments. The mere fact that the jury responded eagerly to this possibility is not reflective of coercion but instead of the jury's genuine and appropriate desire for clarification. The jury's subsequent messages identifying the definition of "deliberately" as the focus of its attention confirmed that, as the court and counsel had already concluded, no further instructions would be helpful.

We find no merit in defendant's claim that the trial court prejudicially erred by mentioning the option of additional arguments before the jury declared an impasse. In *People v. Salazar* (2014) 227 Cal.App.4th 1078, the defendant claimed that the trial court had erred by informing a deliberating jury of the option of additional arguments before the jury declared itself at an impasse. (*Id.* at p. 1088.) The Court of Appeal

19

rejected the claim. It found that the court had discretion to inform the jury "of these options in the event an impasse existed." (*Ibid*.) The record in this case does not suggest that the jury was improperly influenced by the court's mention of the possibility of additional arguments. Although the jury did not initially identify its need for clarification concerning "deliberately" as an "impasse," the jury's repeated requests for assistance on this narrow issue reflected that the jury was not making substantial progress on this issue. The fact that the jury swiftly thereafter reported that it was at an impasse suggests that the trial court's actions were not premature. Certainly we see nothing in the record to suggest, as defendant seems to imply, that the court coerced the jury to falsely declare an impasse in order to permit additional arguments.

Defendant contends that the trial court abused its discretion in permitting additional arguments because, in doing so, the court "direct[ed] an actively deliberating jury away from the instructions and evidence to rely on counsel's arguments." He argues that it was too early in the jury's deliberations to take this step. We disagree.

The jury was at an impasse on premeditation and deliberation after a full day of deliberations, and the parties had agreed that there were no additional instructions that could properly be given on this issue. The original defense argument had not significantly addressed this issue, and the jury desired additional arguments on this issue. We do not view the stage of deliberations as too premature for the court to consider additional arguments as a means of addressing the jury's inquiries. Under these circumstances, the trial court could have reasonably concluded that permitting additional arguments would be helpful to the jury. (§ 1138; Cal. Rules of Court, rule 2.1036.)

Defendant argues that the prosecutor improperly used the additional argument time to "[r]eargue the [f]acts" rather than to "[d]efine or [e]xplain the [t]erms." Since the parties had agreed that no instructions could further define premeditation or deliberately, the only possible purpose for additional arguments was to relate the evidence to the instructions that the jury had already been given. This is precisely what the prosecutor

20

did. He pointed to the instructional language at issue and spent the bulk of his time detailing the evidence that supported a finding under that language that defendant acted deliberately and with premeditation. Defendant's trial counsel did not object to these aspects of the prosecutor's argument.[7] And we see no basis for any objection. The court had instructed the jury that "[n]othing that the attorneys say is evidence." The purpose of argument to the jury is to relate the evidence presented at trial to the instructions given by the court. Here, with the jury clearly seeking guidance on how to apply the court's instructions on premeditation and deliberation, the prosecutor properly identified the evidence that the prosecution was relying on to show premeditation and deliberation and related that evidence to the instructions. We see no impropriety.

Defendant also contends that the trial court's interruption of his trial counsel's additional argument "was a clear indication that the court disapproved of" that argument. Defendant makes no attempt to defend the propriety of the argument of his trial counsel, which the trial court accurately concluded was "misleading the jurors" and "not a correct statement of the law." Nothing that the trial court conveyed to the jury, other than the interruption itself, conveyed "disapprov[al]," and the interruption itself was necessary because the argument was becoming increasingly improper and misleading. The only thing the trial court actually told the jury was that defendant's trial counsel "will refocus her argument." We see no basis for a conclusion that the jury was thereby improperly influenced by the trial court adversely to the defense.

Accordingly, we find no errors in connection with the additional arguments.

### B.      *Sentence For Attempted Murder*

Defendant contends, and the Attorney General agrees, that the trial court erred in imposing a term of 15 years to life for the attempted murder count. We agree. That is

---

[7] Defendant's trial counsel made two narrow objections (one of which was sustained) to the prosecutor's arguments related to the defense's firearm expert's testimony. Defendant does not address these objections on appeal.

not the authorized term for attempted murder with premeditation and deliberation. (§ 664, subd. (a).)

The trial court apparently relied on the probation report, which recommended a term of 15 years to life for the attempted murder count, and the prosecution's request for that term.[8] Defendant's trial counsel did not point out the error to the trial court. Instead, she asked the court to exercise its discretion to strike the firearm enhancements and impose a term of 40 years to life, which she asserted "the current statutory scheme requires this court" to impose, even though she argued that it would be a "cruel and unusual" sentence.

The correct term for the attempted murder count is life with the possibility of parole. (§§ 664, subd. (a), 3046.) We will direct the trial court to correct this error.[9]

## V. DISPOSITION

The judgment is reversed, and the matter is remanded with directions to the trial court to prepare an amended abstract of judgment correctly identifying the term for the attempted murder count as life with the possibility of parole as specified in section 664, subdivision (a). The court shall forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

---

[8] The court imposed the recommended sentence of 90 years to life and stated that this was "the right sentence" and "a just sentence." The sentence was composed of consecutive terms of 25 years to life for the murder, 25 years to life for the firearm enhancement attached to it, 15 years to life for the attempted murder, and 25 years to life for the firearm enhancement attached to it. A term for the shooting at an occupied vehicle count along with its firearm enhancement was stayed under section 654.

[9] The Attorney General argues that we should remand the matter for resentencing because the trial court "did not impose the maximum possible sentence, but instead stayed the enhancement for infliction of great bodily injury . . . ." This is not true. A great bodily injury enhancement under section 12022.7 cannot be imposed where, as here, a section 12022.53, subdivision (d) enhancement has been imposed. (§ 12022.53, subd. (f).) Thus, the trial court *did* impose the maximum possible sentence, and resentencing would serve no purpose.

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

DANNER, J.


*People v. Ramos*
H046895